# **Exhibit A**

**Revised APA**

# AMENDED AND RESTATED
# ASSET PURCHASE AGREEMENT

**by and among**

**THE FIREMAN GROUP CAFE CONCEPTS, INC.**
**AND THE AFFILIATES THEREOF SIGNATORY HERETO**

**as Sellers,**

**SMJ GROUP, INC., SMJ GROUP, L.L.C., SFAP GROUP, LLC, AND S.M.F. GROUP INC.**

**as IP Sellers,**

**and**

**FHG ACQUISITION, LLC,**

**as Purchaser.**

Dated as of October 19, 2026

# TABLE OF CONTENTS


RECITALS .......... 1

**Article I PURCHASE AND SALE** .......... 2

1.1 Purchased Assets .......... 2
1.2 Excluded Assets .......... 5
1.3 Assumed Liabilities .......... 6
1.4 Excluded Liabilities .......... 8
1.5 Assigned Agreements .......... 10
1.6 Certain Trademarks .......... 11

Article II **PURCHASE PRICE; ALLOCATION** .......... 13

2.1 Purchase Price .......... 13
2.2 Deposit .......... 14
2.3 Allocation of the Purchase Price .......... 14
2.4 Purchase Price Adjustment .......... 15

Article III **CLOSING** .......... 15

3.1 Closing .......... 15
3.2 Deliverables .......... 15
3.3 Purchaser’s Obligation to Close .......... 16

Article IV **SELLERS’ REPRESENTATIONS** .......... 16

4.1 Organization, Qualification .......... 16
4.2 Authorization, Execution and Delivery .......... 16
4.3 Consents and Approvals .......... 16
4.4 No Conflict .......... 17
4.5 Litigation and Legal Proceedings .......... 17
4.6 Personal Property .......... 17
4.7 Title to Purchased Assets .......... 17
4.8 Licenses and Permits .......... 17
4.9 Financial Statements .......... 17
4.10 Real Property Representations .......... 18
4.11 Data Security .......... 18
4.12 Environmental Matters .......... 18
4.13 Intellectual Property .......... 18
4.14 Intellectual Property Non-Infringement .......... 18
4.15 Liquor Licenses .......... 18
4.16 Reserved. .......... 19
4.17 Compliance with Laws .......... 19
4.18 Brokerage .......... 19

4.19 Reserved. .....19
4.20 Assigned Agreements .....19
4.21 Gift Cards.. .....19
4.22 Labor Matters .....19
4.23 Insurance .....19

Article V **PURCHASER'S REPRESENTATIONS** ..... 20

5.1 Organization, Qualification .....20
5.2 Authorization, Execution and Delivery .....20
5.3 No Conflicts .....20
5.4 Litigation and Legal Proceedings .....21
5.5 Brokerage .....21
5.6 Financing .....21
5.7 Good Faith .....21
5.8 Non-Reliance .....21

Article VI **"AS IS" ACKNOWLEDGMENT** ..... 21

Article VII **COVENANTS** ..... 22

7.1 Cooperation With Respect To Closing Conditions .....22
7.2 Best Efforts .....22
7.3 Conduct Pending the Closing .....23
7.4 Employment Matters .....24
7.5 Confidentiality .....25
7.6 Sales and Transfer Taxes .....27
7.7 Bulk Sales .....27
7.8 Backup Bidder .....27
7.9 Break-Up Fee; Expense Reimbursement .....28
7.10 Schedule Delivery .....28

Article VIII **REQUIRED APPROVALS** ..... 28

8.1 Bankruptcy Court Approval .....28
8.2 Bankruptcy Filings .....29
8.3 Adequate Assurance .....29
8.4 Required Consents; Transition Agreement .....30
8.5 Designation Rights .....32

Article IX **CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS** ..... 33

9.1 Accuracy .....33
9.2 Performance .....33
9.3 Deliverables .....33
9.4 No Material Adverse Effect .....33
9.5 Sale Order; No Injunction .....34
9.6 Assignment Order .....34

Article X **CONDITIONS PRECEDENT TO SELLERS' OBLIGATIONS** .......... 34

10.1 Accuracy .......... 34
10.2 Performance .......... 34
10.3 Deliverables .......... 34
10.4 Sale Order; No Injunction .......... 34

Article XI **TERMINATION** .......... 35

11.1 Termination .......... 35
11.2 Effect of Termination .......... 36

Article XII **MISCELLANEOUS** .......... 37

12.1 Time is of the Essence .......... 37
12.2 Further Assurances .......... 37
12.3 Post-Closing Name Change .......... 37
12.4 Notices .......... 37
12.5 Expenses .......... 38
12.6 Privacy .......... 39
12.7 Post-Closing Access .......... 39
12.8 Receipt Forwarding .......... 39
12.9 Post-Closing Payments .......... 39
12.10 Assignment .......... 39
12.11 Specific Performance .......... 40
12.12 No Survival. .......... 40
12.13 Governing Law .......... 40
12.14 Severability .......... 41
12.15 Section Headings .......... 41
12.16 Interpretation .......... 41
12.17 No Third Party Beneficiaries .......... 41
12.18 Waiver of Jury Trial .......... 41
12.19 Amendments; Waiver .......... 41
12.20 Entire Agreement .......... 41
12.21 Counterparts .......... 42
12.22 Effectiveness; Irrevocable Offer .......... 42
12.23 Limitation of Liability; Non-Recourse .......... 42
12.24 Disclosure Schedules .......... 42

ANNEX I .......... 1

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

This Amended and Restated Asset Purchase Agreement ("**Agreement**") is made and entered into as of October 19, 2026 (the "**Execution Date**"), by and among (i) Broadway Hospitality Venture, LLC, a Delaware limited liability company, Cieli Partners, L.P., a New York limited partnership, Fiorello's Roman Cafe, Inc., a New York corporation, Brasserie 57 LLC, a Delaware limited liability company, Brooklyn Diner USA, Inc., a New York corporation, Brooklyn Diner USA, L.P., a Delaware limited partnership, Italian Cafe Concepts, LLC, a Delaware limited liability company, Cafe Concepts (Washington DC), LLC, a Delaware limited liability company, Ebbets Field Venture, LLC, a Delaware limited liability company, Ebbets Field Venture II, LLC, a Delaware limited liability company, The Finer Diner, LLC, a Delaware limited liability company, Red Eye Grill, L.P., a Delaware limited partnership (the "**RedEye Seller**"), and The Fireman Group Cafe Concepts, Inc., a New York corporation (each, a "**Seller**" and collectively, the "**Sellers**"), (ii) S.M.F. Group Inc., a New York corporation, SMJ Group, Inc., a New York corporation, SMJ Group, L.L.C., a New York limited liability company, and SFAP Group, LLC, a New York limited liability company (each, an "**IP Seller**" and collectively, the "**IP Sellers**"), joining this Agreement solely for the purposes set forth in Section 1.6 below, and (iii) FHG Acquisition, LLC, a Texas limited liability company (together with its permitted successors, designees and assigns, "**Purchaser**"). Sellers and Purchaser are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

**RECITALS**

WHEREAS, Sellers and certain of their Affiliates have commenced voluntary cases for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") that are being jointly administered under case no. 26-11893 (SAB) (the "**Bankruptcy Cases**"), and Sellers and their Affiliate debtors are continuing to manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Sellers (excluding the RedEye Seller), IP Sellers, and Purchaser entered into an Asset Purchase Agreement, dated as of September 22, 2026 (the "**Original Agreement**"), for the sale and purchase of certain assets of Sellers and IP Sellers party thereto;

WHEREAS, at the Auction, Purchaser agreed to make certain changes to the purchase price and assets to be sold by Sellers and IP Sellers;

WHEREAS, the Parties desire to amend and restate the Original Agreement in its entirety in this Agreement to reflect the modifications to the sale of Sellers' and IP Sellers' assets to Purchaser as a result of the Auction;

WHEREAS, subject to the terms and conditions set forth herein, Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the assets described in this

Agreement, including those related to Sellers' restaurants operating under the names of Café Fiorello, Trattoria Dell'Arte, Bond 45, Café Paradiso, Brooklyn Diner, Fiorella Italian Kitchen & Pizzeria, USA Brooklyn Delicatessen, Café Fiorello (DC), and Paris Bar & Le Jardin Rooftop (collectively, the "**Restaurants**" or the "**Business**"), free and clear of related liens, claims and interests to the fullest extent permitted by and in accordance with sections 105, 363, 365, 1146 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to a Bidding Procedures Order (as defined below) and a Sale Order (as defined below) to be entered in the Bankruptcy Cases; and

WHEREAS, capitalized terms used and not otherwise defined in this Agreement have the meaning set forth in Annex I attached hereto.

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants and agreements set forth herein, the Parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE

1.1 Purchased Assets. At the Closing and on the terms and subject to the conditions set forth in this Agreement, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in and to the following tangible and intangible assets, properties and rights used by Sellers in the operation of the Business (the "**Purchased Assets**"), free and clear of all Interests, in each case other than the Assumed Liabilities and to the extent having arisen, accrued or otherwise existing as of the Closing:

(a) subject to Section 1.5, Section 8.5, and Section 8.4(a) hereof, all of Sellers' right, title and interest in and to all Contracts identified on Schedule 1.1(a) (collectively, the "**Assigned Agreements**"), including without limitation (i) the pro rata proceeds of any advanced payments made in respect of any management agreements included in the Assigned Agreements, and (ii) all right, title and interest of Sellers in and to their leases of the premises of the Restaurants identified on such schedule and all related improvements, easements, rights-of-way and other appurtenances (the "**Assumed Real Property Leases**");

(b) all of Sellers' right, title and interest in and to all (i) office equipment, computers, computer hardware, computer equipment, tools, point of sale systems, information technology infrastructure, and related software; (ii) furniture, fixtures, smallwares, supplies, office supplies, goods, materials, and inventory (other than alcoholic beverage inventories in jurisdictions where the Law does not permit Purchaser to take title to such inventories until Purchaser obtains the requisite Liquor License approvals from the pertinent Governmental Authority, in which case Sellers shall transfer such inventories to Purchaser upon issuance of the requisite approvals from the relevant Governmental Authority); and (iii) appliances, improvements, equipment, machinery

and other tangible personal property, in each case located at any Restaurant, including without limitation the items identified on Schedule 1.1(b), and all warranties and licenses of Sellers thereunder or related thereto; *provided that* any of the foregoing that is held by Sellers pursuant to any Contract will not be included among the Purchased Assets unless such Contract is assumed and assigned to Purchaser as an Assigned Agreement at the Closing;

(c) all intellectual property of Sellers, including without limitation all trademarks, copyrights, patents, trade secrets, know-how, brand names, domain names, telephone numbers, customer lists, ingredient lists, recipes, menus, and any other confidential or proprietary information, that is primarily used in, primarily held for use in, or necessary for the operation of the Business as currently conducted, including without limitation the items identified on Schedule 1.1(c);

(d) all cash, cash equivalents and similar cash items at each Continuing Restaurant (as defined herein) on the Closing Date in cash registers, safes, strongboxes and lock boxes consistent with past practice, and all rights to payment and settlement proceeds in respect of credit card, debit card and charge card transactions arising from sales at the Restaurants in the ordinary course of business on or prior to the Closing Date, to the extent not settled and paid to Sellers as of the Closing (collectively, the "**Card Receivables**"), together with Sellers' rights under the applicable merchant and processing agreements to receive the same; Purchaser shall take the Card Receivables subject to, and shall bear, all processing fees, interchange, chargebacks, refunds and holdbacks in respect thereof; provided, however, that the Card Receivables shall not include any amounts that are the subject of, or recoverable in respect of, any claim or cause of action described on Schedule 1.2, including the adversary proceedings referenced therein;

(e) all promotional allowances, vendor rebates and similar items to the extent relating to the operation of the Business, including without limitation the items identified on Schedule 1.1(e); and all other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing;

(f) all prepaid expenses of Sellers related to the Purchased Assets, all prepayments, security deposits relating to any Assigned Agreement, and all warranties, guarantees, refunds or reimbursements relating to the operation of the Business or the Purchased Assets (collectively, "**Prepaid Expenses**");

(g) all utility deposits, security deposits, and other deposits held by vendors, lessors or trade creditors under any Assigned Agreement;

(h) to the extent transferable or assignable, all of Sellers' rights and interests in and to all licenses, certificates of occupancy, permits, registrations, or approvals that are used in the operation of the Business, including without limitation the items identified on Schedule 1.1(h) (collectively, "**Permits**");

(i) all books and records, reports, filings, accounting information, files, data, data bases, correspondence, notices, and other information (in each case, in whatever form or medium) relating to the Business or the Purchased Assets and Assumed Liabilities, other than Records related to income Taxes of Sellers, except to the extent constituting an Excluded Asset (collectively, the "**Books and Records**"); *provided* that Sellers may retain originals or copies of any such Books and Records, and Purchaser will provide the Sellers with reasonable access to the Books and Records (at no cost to the Sellers), as necessary or appropriate for Sellers to fulfill their fiduciary and administrative duties, including, without limitation, tax preparation, claims reconciliation, prosecution of retained actions, and the winding up of their affairs;

(j) all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to either or both the Purchased Assets and the Assumed Liabilities (or any portion thereof), all as described or listed on Schedule 1.1(j), or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with the sale process pursuant to the Bidding Procedures Order) to the extent relating to the Business;

(k) all claims and causes of action that may be asserted pursuant to any theory or on any grounds, including without limitation pursuant to sections 502(d), 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar state or federal statutes or common law (including without limitation fraudulent transfer laws), to the extent against (i) Purchaser or its Affiliates, (ii) any counterparty to any Assigned Agreement, (iii) any Transferred Employees (as defined below), or (iv) any vendor or supplier of the Business who has provided goods or services to the Business or any Restaurant in the 90 days prior to the Closing (collectively, the "**Included Actions**"); *provided* that Sellers shall retain and may assert against any such Person (other than Purchaser or its Affiliates) all such claims solely as a defense against and offset to any claim filed against Sellers or their estates;

(l) all assets specifically described or listed on Schedule 1.1(l) hereof;

(m) all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property Rights owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting either or both any Purchased Assets and Assumed Liabilities; and

(o) all of Sellers' right, title and interest in and to all customer and guest deposits, advance payments, prepayments, and other amounts received or collected by any Seller

prior to the Closing in respect of events, functions, banquets, catering, private dining, parties, reservations, or similar bookings scheduled to be held, or goods or services to be provided, at any Restaurant on or after the Closing Date (collectively, the "Advance Event Deposits"), together with all of Sellers' right, title, and interest in and to the related booking, event, and catering agreements; provided that the cash constituting the Advance Event Deposits shall be retained by Sellers as an Excluded Asset, and Purchaser shall receive the economic benefit thereof solely as a reduction of the Purchase Price by the Advance Event Deposit Credit in accordance with Section 2.1 and Section 2.4;

1.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include, and in no event shall Sellers be deemed to sell, transfer, assign, or convey, the following assets (collectively, the "**Excluded Assets**"):

(a) all assets other than Purchased Assets;

(b) all of Sellers' rights under this Agreement;

(c) all cash, cash equivalents and bank accounts of Sellers, and all cash in any bank or deposit account, other than (i) cash and Card Receivables described in Section 1.1(d) and (ii) the security, utility and other deposits described in Sections 1.1(f) and 1.1(g);

(d) all intercompany receivables;

(e) all claims and causes of action of Sellers that are not Included Actions, including without limitation all claims and causes of action of Sellers against or relating to any merchant cash advance funder;

(f) all Avoidance Actions that are not Purchased Assets.

(g) all Contracts that are not Assigned Agreements;

(h) all software or other items of intangible property held by Sellers pursuant to a Contract that is not or does not become an Assigned Agreement;

(i) all equity securities of any Seller or any of their Affiliates;

(j) all tax refunds, benefits, attributes, or proceeds relating to periods prior to the Closing;

(k) all insurance premiums, policies, contracts and coverage obtained by Sellers or under which any Seller is a named or additional insured, including any insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries; provided, however, that this exclusion shall not apply to any insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Purchased Asset between the Execution Date and the Closing Date, which shall constitute Purchased Assets; provided further

that documents and records relating to any insurance policy, claim or proceeding, to the extent otherwise constituting Books and Records, are Purchased Assets under Section 1.1(i);

(l) all personnel or other records to the extent pertaining to any current or former employee who is not a Transferred Employee or that cannot be transferred under applicable Law;

(m) all (i) corporate or limited liability organizational records, minute books, charter documents, record books, and stock transfer books pertaining to Sellers, (ii) original tax, accounting and financial records which pertain exclusively to the Excluded Assets, (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence, or capitalization of Sellers or of any other Person, and (iv) such Books and Records relating to Excluded Assets in the pre-Closing period as are necessary or appropriate for Sellers to effect a sale of any Excluded Assets on a going concern basis;

(n) all materials containing privileged communications or information about employees, disclosure of which would violate the employee's rights of privacy or other employee rights under applicable law, and any other materials which are subject to attorney-client or any other privilege or protection from production; and

(o) all assets specifically described or listed on Schedule 1.2 hereof.

1.3 Assumed Liabilities.

(a) At the Closing, Purchaser shall assume and agree to pay, perform and discharge, when due, and only to the extent provided below, all of the following Liabilities of Sellers to the extent related to the Business and not already performed or discharged (collectively, the "**Assumed Liabilities**"):

(i) all Cure Costs relating to the Assigned Agreements;

(ii) all Liabilities under the WARN Act (as defined below) arising from (i) any failure by Purchaser to comply with Section 7.4(b), (ii) the termination of employment of any Restaurant Employee by Purchaser or any of its Affiliates on or after the Closing, or (iii) any decision by Purchaser not to hire, or to condition the hiring of, any Restaurant Employee, in each case solely with respect to the Restaurants and the Restaurant Employees employed at the Restaurants, and excluding any Liabilities relating to any restaurant, location, facility or employee of any Seller that does not constitute a Restaurant or Restaurant Employee, respectively, and, notwithstanding anything to the contrary in this Agreement, all Liabilities under the WARN Act with respect to (A) all employees of Sellers employed at any Restaurant for which the associated Real Property Lease is designated as an Assumed Real Property Lease or a Designation Rights Asset on the date of this Agreement, without regard to whether such Real Property Lease becomes an Assumed Real Property Lease at Closing or thereafter, and (B) all Headquarters Employees;

(iii) all Liabilities for Gift Cards issued by any Seller in the ordinary course of business solely to the extent of Purchaser's obligation to honor the remaining face value

thereof as a credit against purchases of food and beverages at the applicable Restaurant, without any obligation to redeem such Gift Cards or gift certificates for cash or provide any cash refund or cash back;

(iv) the following Liabilities of Sellers incurred after the Petition Date relating exclusively to the Restaurants and outstanding as of the Closing (collectively, the "**Current Working Capital Liabilities**"), in each case solely to the extent such Liabilities are not Past Due as of the Closing:

(A) all amounts payable to vendors or suppliers for food purchased for the Restaurants for which not more than seven (7) days have elapsed since the applicable invoice date; provided that any such amount for which more than seven (7) days have elapsed since the applicable invoice date shall be deemed Past Due and shall be an Excluded Liability;

(B) all amounts payable to vendors or suppliers for alcoholic or non-alcoholic beverages purchased for the Restaurants for which not more than thirty (30) days have elapsed since the applicable invoice date; provided that any such amount for which more than thirty (30) days have elapsed since the applicable invoice date shall be deemed Past Due and shall be an Excluded Liability;

(C) all accrued but unpaid sales, use or similar Taxes collected or required to be collected by any Seller in connection with the operation of the Restaurants on or after the Petition Date and solely to the extent the applicable due date for the payment or remittance of such Taxes to the applicable Governmental Authority has not occurred on or prior to Closing; provided that any such Taxes for which the applicable due date for payment or remittance occurs on or prior to the Closing shall be deemed Past Due and shall be an Excluded Liability;

(D) all accrued but unpaid wages, salaries and other ordinary-course cash compensation payable to employees of Sellers employed at the Restaurants solely to the extent the applicable regularly scheduled payment date therefor has not occurred as of the Closing; provided that any such amounts for which the applicable payment date has occurred on or prior to the Closing shall be deemed Past Due and shall be an Excluded Liability; and

(E) all other amounts payable to third-party vendors or service providers for goods or services provided to the Restaurants in the ordinary course of business, including repair and maintenance expenses, solely to the extent the applicable payment date stated on the applicable invoice or otherwise agreed with the applicable vendor or service provider has not occurred as of the Closing; provided that any such amount for which the applicable payment date has occurred on or prior to the Closing shall be deemed Past Due and shall be an Excluded Liability.

Notwithstanding anything to the contrary in this Agreement, including Sections 1.4(b), 1.4(h), 1.4(i) and 1.4(k): (1) Purchaser shall assume any Current Working Capital Liabilities as of the Closing at each Covered Restaurant that (i) satisfy clauses (A) through (E) above, (ii) are not Past Due, and (iii) are set forth on the Current Working Capital Liabilities Statement as finally determined under Section 2.4; and in no event shall Purchaser be required, pursuant to this paragraph, to assume, pay, or reimburse any amount that is not so set forth, that arises or accrues after the Closing (which shall be governed by Section 8.4(c)), or that is otherwise an Excluded Liability; (2) solely for purposes of the foregoing clause (1), (x) an amount relating to one or more Covered Restaurants and to any other location or operation of Sellers relates exclusively to the Restaurants only to the extent allocable to the Covered Restaurants (and, for the avoidance of doubt, Purchaser shall not assume any Corporate Level liability or any amount allocable to any location that is not a Covered Restaurant), and (y) Section 1.3(a)(iv)(D) shall be deemed to include the employer portion of payroll, employment and similar Taxes on the amounts otherwise described in such Section; (3) no Liability assumed by Purchaser under clause (1) shall be an Excluded Liability under Section 1.4(b), 1.4(h) or 1.4(i); (4) Current Working Capital Liabilities shall not include any Liabilities incurred by or with respect to any location operated as a Fiorella Italian Kitchen & Pizzeria or any location that is not a Covered Restaurant, and (5) no amount shall be assumed, paid, or reimbursed more than once, and Current Working Capital Liabilities shall exclude any amount that also constitutes a Cure Cost or that Purchaser otherwise funds, pays, or assumes under this Agreement.

(v) all Liabilities of Sellers to be performed from and after the Closing under the Assigned Agreements;

(vi) all Liabilities of Sellers for the Hilco Fee, which shall be satisfied at Closing;

(vii) to the extent transferable pursuant to applicable Law, all obligations, commitments and Liabilities under any Permits that are assigned to Purchaser pursuant to this Agreement as a Purchased Asset, but solely to the extent such obligations, commitments and Liabilities arise from facts, events or circumstances occurring from and after the Closing, and excluding any obligations, commitments or Liabilities arising from or relating to any facts, events, circumstances, acts or omissions occurring prior to the Closing;

(viii) all Liabilities for Transfer Taxes in accordance with <u>Section 7.6;</u>

(ix) all outstanding accounts payable as of the Closing, in each case solely to the extent payable to trade vendors that are counterparties to Assigned Agreements as accrued or incurred in the ordinary course after the Petition Date and entitled to priority under section 503(b) of the Bankruptcy Code; and

(x) all Liabilities of Sellers to Transferred Employees for vacation days or other paid time-off that is earned or accrued by, but not yet payable to, employees, officers, directors or contractors of Sellers that Purchaser hires as an employee as part of this Transaction; provided that, no later than five (5) Business Days prior to the Closing, Sellers shall deliver to

Purchaser a schedule setting forth, for each Transferred Employee, the number of accrued but unused vacation days and paid time-off and the dollar value thereof.

(b) Notwithstanding anything to the contrary contained herein, if Purchaser is required, whether pursuant to applicable Law, any requirement of a Governmental Authority, the Sale Order, any other Order of the Bankruptcy Court or otherwise as a condition to the consummation of the Sale Transaction or Purchaser's acquisition, ownership or operation of any Purchased Asset, to pay, satisfy, discharge or assume any Liability of any Seller other than the Cure Costs or the Assumed Liabilities (each, an "**Additional Required Liability**"), the Base Purchase Price shall be reduced on a dollar-for-dollar basis by the amount of such Additional Required Liability paid, satisfied, discharged or assumed by Purchaser. Notwithstanding anything to the contrary in this Agreement, all Additional Required Liabilities, and the amount of any reduction of the Base Purchase Price in respect thereof, shall be identified and mutually agreed on by the Parties, or fixed by the Bankruptcy Court, no later than 2 days prior to the Closing Date, and thereafter the Base Purchase Price shall not be subject to any post-Closing reduction, adjustment or true-up in respect of any Additional Required Liability.

1.4 Excluded LiabilitiesNotwithstanding anything to the contrary in this Agreement, each Seller will retain, and remain liable and obligated for such Seller's respective liabilities not otherwise included in the Assumed Liabilities and the Parties expressly acknowledge and agree that Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers of any nature, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**"). For the avoidance of doubt, nothing in this Section 1.4 shall be construed to relieve Purchaser from any Liability arising out of Purchaser's ownership, operation or use of the Purchased Assets or the Business from and after the Closing. Without limiting the generality of the foregoing, Excluded Liabilities shall include, without limitation:

(a) all Employee Benefit Plan liabilities and obligations, including, without limitation, for continuation coverage under any Employee Benefit Plan pursuant to the requirements of Section 4980B of the Code and COBRA, and all liabilities and obligations of Sellers relating to employees, former employees, persons laid-off or on inactive status, or their respective dependents, heirs or assigns, who have received, who are receiving as of the Closing Date, or who are or could become eligible to receive any short-term or long-term disability benefits or any other benefits of any kind arising out of or related in any way to the employment of persons by Sellers.

(b) any liabilities and obligations that relate solely to Sellers' Corporate Level operations and employees;

(c) all claims, charges, lawsuits, and causes of action (whether known or unknown, asserted or unasserted) based on employment discrimination (including age, race, color, sex, national origin, religion, or disability), violations of personnel policies, common law employment claims (including wrongful discharge, invasion of privacy, and defamation), and all

obligations to pay wages, bonuses, benefits, severance, or damages arising from violations of applicable employment or labor laws, in each case arising prior to the Closing Date;

(d) except as set forth in Section 1.3(a)(ii), all liabilities and obligations under the Worker Adjustment and Retraining Notification Act of 1988, or similar state or local law regarding employee terminations, if any, arising out of or resulting solely from layoffs or termination of employees by Sellers;

(e) all claims arising under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. and the Packers and Stockyards Act, 7 U.S.C. §181 et seq or their state law correlates arising out of or resulting from Sellers' operations prior to the Closing Date;

(f) all liabilities, or corrective or remedial obligations with respect to the operation of the Business that arise under or relate to any environmental Laws (including without limitation any relating to exposure to any hazardous materials);

(g) any liabilities to any broker, finder, agent or similar intermediary for any broker's fee, leasing agent's fee, finder's fee or similar fee or commission relating to the transactions contemplated by this Agreement for which any Seller or its Affiliates are responsible, other than the Hilco Fee;

(h) except as set forth in Section 1.3(a)(x), all liabilities and obligations related to any wages, bonuses or other compensation or benefits, including without limitation, vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to, employees, officers, directors or contractors of Sellers, including any Restaurant Employees who are not Transferred Employees, prior to the Closing;

(i) any liabilities and obligations arising out of, relating to or resulting from any restaurant, location, business, operation, asset or property of any Seller that is not a Restaurant, does not constitute part of the Business or is not otherwise included in the Purchased Assets, including any such Liabilities or obligations relating to businesses, operations, assets or properties retained by any Seller or otherwise constituting Excluded Assets.

(j) any Liability described in Section 1.3(a)(iv) that is Past Due as of the Closing; and

(k) except as expressly included in Section 1.3(a), all Liabilities for Taxes attributable to any taxable period (or portion thereof) ending on or prior to the Closing Date or arising from the ownership or operation of the Business or Purchased Assets on or prior to the Closing, including income, payroll, personal property, franchise, sales, use and similar Taxes, regardless of whether any such Liability is imposed upon, asserted against or required to be paid by Purchaser following the Closing.

1.5 Assigned Agreements.

(a) Subject to this Section 1.5 and Section 8.5 and in accordance with the Bidding Procedures Order and the Sale Order, at the Closing Sellers shall assume and assign to Purchaser, pursuant to the Sale Order or other order of the Bankruptcy Court, all Assigned Agreements that may be assigned under sections 363 and 365 of the Bankruptcy Code, subject to Purchaser providing any adequate assurance required under section 365 of the Bankruptcy Code and paying the Cure Costs. Sellers may reject any Contract not listed on Schedule 1.1(a) at any time.

(b) Purchaser shall pay or otherwise satisfy all Cure Costs as part of the Total Consideration in Section 2.1, and shall assume, and thereafter in due course and in accordance with their respective terms, pay and fully satisfy, discharge and perform all of the obligations under each Assigned Agreement pursuant to section 365 of the Bankruptcy Code. Purchaser is and shall remain obligated to timely consummate the Closing (including paying the Purchase Price in full at Closing) and comply with its obligations under this Agreement and any Ancillary Document and shall not have the right to terminate this Agreement as a result of the failure to assume and assign any such Contract; provided, however, that if any Assumed Real Property Lease cannot be assumed and assigned to Purchaser at Closing and such inability to assume or assign any such Assumed Real Property Lease is not caused solely by Purchaser, then Purchaser shall have the right to terminate this Agreement upon written notice to Sellers and receive a return of the Deposit. Notwithstanding anything to the contrary herein, no Seller shall be required to pay or assume any Cure Costs or provide any assurances, and no Seller shall be obligated to assume and assign any Contract with respect to which Purchaser fails to satisfy such Cure Costs or demonstrate adequate assurance of future performance as determined by the Bankruptcy Court.

(c) (i) To the extent a counterparty to a Contract objects or otherwise challenges the Cure Costs determined by Sellers and asserts a different monetary amount that must be paid or nonmonetary obligations that otherwise must be satisfied, including pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Purchaser to assume such Contract (any such Contract, a "**Disputed Agreement**"), and such objection or challenge has not been resolved prior to the Closing, then Purchaser shall provide prompt written notice prior to the Closing Date either (x) electing to remove any such Disputed Agreement from Schedule 1.1(a), in which case the Contract will be an Excluded Asset and not assigned to Purchaser or (y) designating such Contract as a Designation Rights Asset in accordance with Section 8.5.

(ii) If Purchaser does not deliver written notice agreeing to assume such Disputed Agreement and pay all Cure Costs associated with such Disputed Agreement no later than the expiration of the Designation Rights Period or such dispute is not resolved by the expiration of the Designation Rights Period, such Disputed Agreement shall automatically be deemed an Excluded Asset. Without limiting the foregoing, in the event that a dispute relating to a Disputed Agreement is resolved adversely to Purchaser by the Bankruptcy Court, upon written notice from Purchaser to Sellers within one (1) Business Day thereafter, such Disputed Agreement shall thereafter be deemed an Excluded Asset for all purposes under this Agreement.

(iii) If any Disputed Agreement that is an Assumed Real Property Lease becomes an Excluded Asset, Purchaser shall, at its sole cost and within ten (10) days thereafter (or

such shorter period as the applicable lease or the Bankruptcy Court may require), remove all Purchased Assets from the applicable premises and any Purchased Assets not so removed shall be deemed abandoned to Sellers, who may dispose of them without liability to Purchaser.

(iv) Notwithstanding the foregoing, the Designation Rights Period for any Disputed Agreement that is an unexpired lease of nonresidential real property shall not extend beyond the deadline for assumption of such lease under section 365(d)(4) of the Bankruptcy Code, as it may be extended. At Purchaser's request and at Purchaser's sole cost and expense, Sellers shall use commercially reasonable efforts to seek such extensions of such deadline as Purchaser may reasonably request.

(d) From and after the Execution Date and prior to the Closing, Purchaser shall have the right to designate any Assigned Agreement set forth on Schedule 1.1(a) as an Excluded Assets and, in the event of such a designation by Purchaser: (i) such Assigned Agreement shall be removed from Schedule 1.1.(a); (ii) such Assigned Agreement shall thereafter be an Excluded Asset for all purposes of this Agreement; (iii) Sellers shall not assume and assign such Assigned Agreement to Purchaser; and (iv) Purchaser shall have no obligation to pay any Cure Costs in respect of any Assigned Agreement designated by Purchaser as an Excluded Asset. Purchaser's designation of any Assigned Agreement as an Excluded Asset shall not reduce the Purchase Price.

1.6 Certain Trademarks

(a) Sale of Scheduled Marks. At the Closing, each IP Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from such IP Seller, all of such IP Seller's right, title and interest in and to solely the trademarks, service marks, and trademark and service mark registrations and applications identified by registration number or application serial number on Schedule 1.6, together with (i) the goodwill of the business symbolized thereby, (ii) all common-law rights in the marks so identified, (iii) all rights to sue and recover for past, present and future infringement, dilution or other violation thereof, and to collect the proceeds of the foregoing, and (iv) all income, royalties and payments accruing thereunder from and after the Closing (collectively, the "**Scheduled Marks**"), free and clear of all Interests, pursuant to the Sale Order and sections 363(b) and 363(f) of the Bankruptcy Code. The Scheduled Marks constitute Purchased Assets solely for purposes of Sections 8.1, 12.7 and 12.11 and the Sale Order.

(b) No Other Conveyance. Except for the Scheduled Marks, this Agreement, including Sections 1.1(c), 1.1(k), 1.1(m) and 1.1(n), does not convey, and does not obligate any IP Seller to convey, any asset, property or right of any IP Seller. No claim or cause of action of any IP Seller or its estate, including any Avoidance Action, is a Purchased Asset or an Included Action.

(c) Consideration. The consideration for the Scheduled Marks is included in, and not in addition to, the Total Consideration, and no separate amount is payable to IP Seller. The portion of the Total Consideration allocable to the Scheduled Marks shall be determined in

accordance with Section 2.3, and each IP Seller shall be a party to the Allocation Statement solely with respect to the Scheduled Marks.

(d) Representations of IP Sellers. Each IP Seller represents and warrants to Purchaser, as of the Schedule Delivery Date and as of the Closing (or, with respect to the "Eggface" trademark described in Section 1.6(j), only as of the Closing), solely as to itself and the Scheduled Marks identified as owned by it on Schedule 1.6, that: (i) such IP Seller is duly organized, validly existing and in good standing under the laws of the state of its organization; (ii) subject to the entry of the Sale Order, such IP Seller has all requisite power and authority to execute and deliver this Agreement as to this Section 1.6 and to convey the Scheduled Marks, such execution, delivery and performance have been duly authorized by all necessary action, and upon entry of the Sale Order this Section 1.6 constitutes a valid and binding obligation of such IP Seller, enforceable in accordance with its terms; (iii) such IP Seller owns the Scheduled Marks identified as owned by it on Schedule 1.6 and, subject to entry of the Sale Order, at the Closing shall transfer and convey to Purchaser all Scheduled Markes free and clear of all Liens (other than Permitted Liens) in accordance with Section 363 of the Bankruptcy Code and the Sale Order ; (iv) there are no pending or, to IP Sellers' knowledge, threatened claims, actions, or proceedings challenging any IP Seller's ownership of, or infringement by IP Sellers of, any such Scheduled Marks; (v) no Scheduled Mark has been licensed to any Person except as set forth on Schedule 1.6; (vi) Schedule 1.6 identifies the Scheduled Marks and each registration and application made by IP Sellers with respect to the Scheduled Mark, and (vii) each such registration is subsisting and has not been abandoned or cancelled. Except for the representations and warranties of IP Sellers in this Section 1.6, no IP Seller makes any other representation or warranty with respect to the Scheduled Marks.

(e) Covenants of IP Seller. From the Execution Date until the Closing or the earlier termination of this Agreement, each IP Seller shall not sell, assign, transfer, license, encumber, abandon, or permit the cancellation or lapse of, any Scheduled Mark, and shall not commence, settle or compromise any proceeding concerning any Scheduled Mark without Purchaser's prior written consent. From and after the Closing, each IP Seller shall not use any Scheduled Mark or any mark confusingly similar thereto, and shall not adopt, register or apply to register any such mark. Each IP Seller is bound by Section 1.6(j) and Section 12.2 (Further Assurances) as provided therein, and by no other covenant in this Agreement.

(f) Closing Deliverables. At the Closing, each IP Seller shall execute and deliver to Purchaser a trademark assignment with respect to the Scheduled Marks identified as owned by it on Schedule 1.6, in form suitable for recordation with the United States Patent and Trademark Office and, if applicable, any foreign registry, and otherwise in form and substance reasonably acceptable to Purchaser and such IP Seller. The deliverables described in Section 3.2 are not deliverables of any IP Seller.

(g) No Other Obligations; Limited Recourse. No IP Seller is a Seller or a Party; each IP Seller joins this Agreement solely for purposes of this Section 1.6, and has no obligation under this Agreement except as set forth in this Section 1.6 and Section 12.2. No breach by any IP Seller constitutes a breach by any Seller or by the other IP Seller, and no breach by any Seller or Purchaser constitutes a breach by any IP Seller. Purchaser's sole remedies against an IP Seller are

those available against Sellers under Section 12.23(a), applied to such IP Seller mutatis mutandis, and Section 12.23(b) applies to each IP Seller as if it were a Seller. The obligations, covenants, representations and warranties of the IP Sellers under this Section 1.6 are several and not joint.

(h) Incorporated Provisions. Sections 7.10(b) (Schedule Delivery) 12.4 (Notices), 12.13 (Governing Law), 12.14 (Severability), 12.15 (Section Headings), 12.16 (Interpretation), 12.18 (Waiver of Jury Trial), 12.19 (Amendments; Waiver), 12.21 (Counterparts) and 12.22 (Effectiveness; Irrevocable Offer) apply to each IP Seller as if it were a Party, in each case solely in connection with this Section 1.6. No other provision of this Agreement applies to any IP Seller.

(i) IP Seller Contracts. Notwithstanding Sections 1.6(b), 1.6(f), 1.6(g) and 1.6(h), each reference in this Agreement to Sellers with respect to the Assigned Agreements includes the applicable IP Seller with respect to any Contract of such IP Seller identified on Schedule 1.1(a).

(j) <u>"Eggface" Trademark</u>. Prior to Closing, Sellers or IP Sellers shall cause Eggface Hospitality Group, LLC, a Delaware limited liability company, to transfer the "Eggface" trademark (United States Patent and Trademark Office Serial No. 87144437 / Registration No.5,206,460) to convey and transfer to an IP Seller for inclusion in the Scheduled Marks to be purchased and sold by IP Sellers to Purchaser at Closing.

1.7 <u>RedEye Seller</u> Notwithstanding anything to the contrary in this Agreement, RedEye Seller joins this Agreement solely for the purpose of selling, transferring, and assigning its right, title, and interest, if any, in and to the Assigned Agreements to which it is or was a party, and makes no representations or warranties under this Agreement other than the representations set forth in Section 4.1, Section 4.2, Section 4.3, Section 4.4, and Section 4.5 (and then only as to itself). No other representation or warranty in this Agreement shall be deemed made by RedEye Seller, and no breach of any such other representation or warranty shall give rise to any liability of, or claim against, RedEye Seller.

ARTICLE II

**<u>PURCHASE PRICE; ALLOCATION</u>**

2.1 <u>Purchase Price</u>. The aggregate consideration for the sale and transfer of the Purchased Assets by Sellers to Purchaser shall be (a) $22,237,000 in cash (the "**Base Purchase Price**"), as adjusted pursuant to this Agreement, including pursuant to Section 1.3(b) and as reduced by the Advance Event Deposit Credit pursuant to <u>Section 2.4</u> (the "**Purchase Price**"), plus (b) the Cure Costs relating to the Assigned Agreements; plus (c) the Assumed Liabilities. For the avoidance of doubt, except for the Cure Costs and the Assumed Liabilities, Purchaser shall not be required to pay, satisfy or assume any Liability of Sellers in addition to the Base Purchase Price, and any other Liability of Sellers that Purchaser is required to pay, satisfy or assume in connection with the consummation of the Sale Transaction or the acquisition, ownership or operation of the Purchased Assets shall reduce the Base Purchase Price on a dollar-for-dollar basis in accordance

with Section 1.3(b) (the Purchase Price, Cure Costs, and Assumed Liabilities collectively, the "**Total Consideration**"). The Purchase Price shall be paid by Purchaser to Sellers at the Closing in immediately available funds.

2.2 Deposit.

(a) In connection with the Original Agreement and in accordance with, and by the deadline set forth in, the Bidding Procedures, Purchaser paid 10% of the Purchase Price set forth in the Original Agreement, by wire transfer of immediately available funds, to an escrow agent mutually agreed by Sellers and Purchaser (the "**Escrow Agent**"), which amount shall be held in a non-interest-bearing escrow account in accordance with this Agreement (such amount, the "**Deposit").** Purchaser's bid was increased at the Auction and Purchaser shall increase the Deposit to 10% of the increased Purchase Price within 2 Business Days after the conclusion of the Auction. The Deposit shall be applied against the Purchase Price and released to Sellers at Closing.

(b) Upon the termination of this Agreement, the Deposit shall be delivered as set forth in Section 11.2(b) or Section 11.2(c).

(c) Escrow Agent shall hold and dispose of the Deposit in accordance with the terms and provisions of this Agreement. Sellers and Purchaser agree that the duties of the Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Deposit in accordance with this Agreement. Escrow Agent shall incur no liability in connection with the safekeeping or disposition of the Deposit for any reason other than Escrow Agent's fraud, willful misconduct or gross negligence. If Escrow Agent is in doubt as to its duties or obligations with regard to the Deposit, or if Escrow Agent receives conflicting instructions from Purchaser and Sellers with respect to the disposition of the Deposit, then Escrow Agent shall not disburse the Deposit but shall continue to hold such amounts until either (i) Purchaser and Sellers agree in writing as to the disposition, or (ii) an order is entered by the Bankruptcy Court directing the disposition thereof.

2.3 Allocation of the Purchase Price. Prior to Closing, but not as a condition to Closing, Purchaser and Sellers shall use their commercially reasonable efforts to agree upon a statement (the "**Allocation Statement**") setting forth the value of the Purchased Assets that shall be used for the allocation of the Total Consideration among the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If the Parties are able to agree upon the allocation of the Total Consideration, Purchaser and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Total Consideration allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Purchaser and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, Purchaser and Sellers are unable mutually to agree upon the manner in which the Total Consideration should be allocated, Purchaser and Sellers shall be free to make their own respective allocations of the Purchase Total Consideration for tax purposes. Notwithstanding any other

provisions of this Agreement, in the event the Parties hereto mutually agree upon the allocation of the Purchase Total Consideration, Purchaser's and Sellers' obligations under this Section shall survive Closing.

2.4 Purchase Price Adjustment.

(a) Not later than two (2) Business Days prior to the Closing, Sellers shall deliver to Purchaser a statement setting forth in reasonable detail Sellers' good faith calculation of (i) the Cure Costs, (ii) any Additional Required Liabilities known as of such date, and (iii) the Advance Event Deposit Credit (the "**Closing Calculations Statement**"). In the event Purchaser disagrees with or objects to the inclusion of any amounts reflected in the Closing Calculations Statement, Sellers and Purchaser shall work in good faith to resolve any such disagreement or objections prior to Closing. The Purchase Price payable at Closing shall equal the Base Purchase Price minus the aggregate amount, if any, of all Additional Required Liabilities paid, payable, assumed, or otherwise economically borne by Purchaser, without duplication, and minus the Advance Event Deposit Credit. Any asserted Additional Required Liability that is not timely determined pursuant to Section 1.3(b) shall not reduce the Base Purchase Price. "**Advance Event Deposit Credit**" means an amount in cash equal to all Advance Event Deposits received by Sellers and not refunded to the applicable customer, or applied to a completed event, prior to the Closing. The itemized calculation of the Advance Event Deposit Credit, by Restaurant and by booking, shall be accompanied by reasonable supporting documentation, and Purchaser shall have the same right to review and object to the Advance Event Deposit Credit as it has with respect to the other components of the Closing Calculations Statement.

(b) Not later than thirty (30) days after the Closing Date, Sellers shall deliver to Purchaser a statement setting forth in reasonable detail, and itemized by Covered Restaurant and by payee, Sellers' good faith calculation of the Current Working Capital Liabilities as of the Closing, prepared in accordance with the definition of Current Working Capital Liabilities, with supporting invoices, and identifying each amount that a Seller has paid after the Closing (the "**Current Working Capital Liabilities Statement**"). The Current Working Capital Liabilities Statement shall (i) identify, for each amount, the Covered Restaurant to which it is allocable, the payee, and the due date; (ii) be accompanied by a copy of the underlying invoice or other supporting documentation for each amount and, for any amount identified as paid by a Seller, reasonable evidence of such payment; and (iii) be accompanied by a certificate of an authorized officer of Sellers certifying that the Current Working Capital Liabilities Statement was prepared in accordance with this Agreement and that each amount set forth therein is a Current Working Capital Liability that is not Past Due, is not an Excluded Liability or a Cure Cost, and is allocable to one or more Covered Restaurants to the extent set forth therein. Any amount for which the invoice, supporting documentation, or evidence of payment required by this Section 2.4(b) is not delivered shall not be a Current Working Capital Liability assumed or payable by Purchaser. Sellers shall, upon Purchaser's reasonable request, provide Purchaser and its representatives reasonable access to the books, records, invoices, and personnel used to prepare the Current Working Capital Liabilities Statement.

(c) Purchaser shall have twenty (20) Business Days after its receipt of the Current Working Capital Liabilities Statement (together with all supporting documentation and the officer's certificate required by Section 2.4(b)) (the "**Review Period**") to review it. Purchaser may object to an amount reflected in the Current Working Capital Liabilities Statement only by delivering to Sellers, within the Review Period, a written notice (an "Objection Notice") identifying each disputed amount and stating in reasonable detail the basis on which Purchaser reasonably disagrees that such amount is a Current Working Capital Liability, is properly supported, is correctly allocated, or is correctly calculated; each amount not so identified in a timely Objection Notice shall be final and binding on the Parties, except that no Excluded Liability, Cure Cost, or amount allocable to any location that is not a Covered Restaurant shall become assumed or payable by Purchaser by reason of Purchaser's failure to object to it. Not later than ten (10) Business Days after the end of the Review Period, Purchaser shall pay, by wire transfer of immediately available funds and without duplication, each amount reflected in the Current Working Capital Liabilities Statement that is not identified in a timely Objection Notice, paying to the applicable Seller each such amount shown as paid by a Seller after the Closing and supported by evidence of payment, and paying each other such amount to the applicable payee when due. Sellers and Purchaser shall work in good faith to resolve any Objection Notice within twenty (20) Business Days after its delivery, and either Party may submit any matter not so resolved to the Bankruptcy Court for determination.

(d) In any such proceeding, Sellers shall bear the burden of establishing that a disputed amount is a Current Working Capital Liability payable by Purchaser under this Agreement. Purchaser shall pay each disputed amount, to the extent agreed by the Parties or determined by the Bankruptcy Court to be a Current Working Capital Liability, within five (5) Business Days after such agreement or determination, to the applicable Seller or payee as provided above. No interest shall accrue on any disputed amount, and Purchaser shall have no liability for any late charge, penalty, or interest arising from non-payment of a disputed amount pending its resolution, except that, with respect to any disputed amount that is subsequently agreed by the Parties or determined by the Bankruptcy Court to be a Current Working Capital Liability, Purchaser shall pay, together with such amount, any late charge, penalty, or interest first imposed on a Seller by the applicable payee thirty (30) days after delivery of the Current Working Capital Liabilities Statement by reason of the non-payment of such amount pending its resolution.

## ARTICLE III

## CLOSING

3.1 Closing. Subject to the terms and conditions hereof, including that all conditions to Closing set forth in Article IX and Article X hereof have been satisfied or waived, the transactions contemplated by this Agreement (the "**Sale Transaction**") shall be consummated (the "**Closing**") at the offices of Sellers' counsel in New York, New York, or remotely by electronic means as the Parties may mutually agree, no later than October 30, 2026, or such other date as may be mutually agreed in writing by the Parties. The Closing shall be deemed to occur and to be effective as of 11:59 p.m. Eastern time on the day of the Closing (the "**Closing Date**").

3.2 Deliverables. At the Closing, the Parties will duly execute and deliver the following documents, each in form and substance reasonably acceptable to Sellers and Purchaser: (i) bill(s) of sale to effect the transfer of Purchased Assets; (ii) an assumption and assignment agreement for the Assigned Agreements or an assignment of the Assumed Real Property Leases (in each case other than any Designation Rights Asset, which shall instead be assumed and assigned upon designation in accordance with Section 8.5); (iii) an instrument for assumption of the Assumed Liabilities; (iv) any transition services agreement required pursuant to Section 8.4(b); (v) a certificate signed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Sections 9.1, 9.2, and 9.4 have been satisfied; and (vi) such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement as Purchaser may request, and prepared by Purchaser and delivered in draft to Sellers not less than 3 Business Days before the Closing, in order to vest in Purchaser all of Sellers' right and title to, and interest in, the Purchased Assets and otherwise fully consummate the transactions contemplated herein.

3.3 Purchaser's Obligation to Close. If the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing itself) have been satisfied or waived, Purchaser shall consummate the Closing on or before October 30, 2026 (or such later date as the Parties may agree in writing pursuant to Section 3.1), and Purchaser's failure to do so shall constitute a material breach of this Agreement. If the Closing occurs after October 30, 2026, then without limiting any other right or remedy of Sellers, Purchaser shall be entitled to all revenue from the Purchased Assets and to the extent such revenue is not sufficient to pay or reimburse all costs, expenses and Liabilities of Sellers arising from or relating to the Restaurants in respect of the period from such date through the actual Closing Date (or date of termination of this Agreement), Purchaser shall pay any shortfall to Sellers at Closing or termination of this Agreement to the extent then outstanding. No condition shall be deemed unsatisfied if such failure was primarily caused by any act or omission by Purchaser.

## ARTICLE IV

## SELLERS' REPRESENTATIONS

Sellers hereby represent and warrant to Purchaser that the following are true and correct as of the Schedule Delivery Date (to the extent applicable) and as of the Closing:

4.1 Organization, Qualification. Each Seller is duly organized, validly existing and in good standing under the laws of the state of such Seller's organization and have all necessary power and authority to own and operate the Restaurants and to carry on the Business as it is now being conducted. Subject to the entry of the Sale Order, Sellers have all requisite power and authority to enter into this Agreement and carry out the transactions contemplated by this Agreement and all agreements, documents and instruments executed and delivered pursuant to or in accordance with this Agreement (collectively, "**Ancillary Documents**").

4.2 Authorization, Execution and Delivery. The execution, delivery and performance of this Agreement and the other Ancillary Documents by Sellers and the transfer or assignment of

the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary action. Subject to obtaining the Sale Order, each Seller has full power, right and authority to sell and convey to Purchaser the Purchased Assets. Upon the entry of the Sale Order, this Agreement is, and this Agreement and each of the other Ancillary Documents when so executed and delivered will be, a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms.

4.3 Consents and Approvals. Except for the entry of the Sale Order by the Bankruptcy Court or as contemplated by Section 8.4(b), no consent, waiver, authorization or approval of any Person, and no declaration, filing or registration with any Governmental Authority, is required in connection with the execution, delivery and performance of this Agreement by Sellers or the consummation of the transactions contemplated hereby.

4.4 No Conflict. Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and the Ancillary Documents by each Seller does not (i) to Sellers' Knowledge, violate or conflict with such Seller's organizational documents, or (ii) violate any applicable Law, Order, judgment or decree, or result in a breach of or default under any material Contract to which such Seller is a party.

4.5 Litigation and Legal Proceedings. Other than the Bankruptcy Cases or as set forth on Schedule 4.5 or Schedule 4.10, there is no outstanding judgment, order, writ, injunction, decree or award of any court, arbitrator, or Governmental Authority against Sellers, and, there is no complaint, litigation, arbitration, investigation or other proceeding of or before any court, arbitrator or Governmental Authority pending, or, to Sellers' Knowledge, threatened, against Sellers or the Purchased Assets which, individually or the in aggregate, could reasonably be expected to (i) result in Sellers' inability to perform their obligations under this Agreement and each of the other Ancillary Documents or (ii) have a Material Adverse Effect.

4.6 Personal Property. The items identified in the Bankruptcy Schedules are all of the real and personal property owned by Sellers as of the Petition Date.

4.7 Title to Purchased Assets. Each Seller owns, and has good, valid, and marketable title to or, with respect to Real Property Leases, a valid leasehold interest in, all of the Purchased Assets owned by such Seller and, subject to entry of the Sale Order, at the Closing, shall transfer and convey to Purchaser all Assumed Real Property Leases and all other Purchased Assets free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) in accordance with Section 363 of the Bankruptcy Code and the Sale Order. Except for such licenses and permits as are not transferable, and except for any shared services provided to the Sellers by its Affiliates, the Purchased Assets comprise all assets, properties, rights, contracts, permits, intellectual property, books and records, goodwill and other rights necessary to own, operate and conduct the Business immediately following the Closing in substantially the same manner as conducted by Sellers immediately prior to the Closing. Except as provided in the immediately preceding sentence, there are no material assets or properties used primarily in the Business that are not included in the Purchased Assets.

4.8 Licenses and Permits. Schedule 4.8 contains a listing of all licenses and permits used by Sellers to operate the Restaurants as currently being conducted.

4.9 Financial Statements. Sellers have made available to Purchaser (i) unaudited consolidated balance sheets and related statements of operations of the Business and (ii) entity level balance sheets and statements of operations of each of the Restaurants (the "**Financial Statements**"). The Financial Statements have been prepared from the books and records of Sellers on an accrual basis consistent with Sellers' internal accounting practices, subject to normal year-end adjustments and the absence of footnotes.

4.10 Real Property Representations. (a) The Real Property Leases constitute all real property leased or used by Sellers in connection with the Business; (b) no eminent domain, condemnation, or similar proceeding by any Governmental Authority is pending or, to Sellers' Knowledge, threatened with respect to any of the Restaurants or any Real Property Lease premises; (c) Schedule 4.10 sets forth a complete list of all Real Property Leases, and Sellers hold valid leasehold interests in the premises leased pursuant to the Real Property Leases; (d) each Real Property Lease is valid, binding and in full force and effect. Without limiting the foregoing, to Sellers' Knowledge, subject to Schedule 4.10 (i) the Sellers have completed the structural repair work required in that certain letter dated August 12, 2021 from the landlord of the Restaurant located at 200 West 57th Street, New York, New York, and (ii) the Sellers have completed all renovations, refurbishments, upgrades and other work required pursuant to Section 6 of that certain Second Amendment to Lease, dated as of November 9, 2022, with respect to the Restaurant located at 1900 Broadway, New York, New York (collectively, the "**Renovations**"), including the expenditure of not less than $750,000 in the aggregate in connection with the Renovations, and all invoices and other amounts owing in respect thereof have been paid in full.

4.11 Data Security. To Sellers' Knowledge, except as set forth on Schedule 4.11, Sellers have not received any notice of any successful or attempted network intrusion, data breach, hack, loss of customer data, or loss of credit card data, and have not found or been notified of any malware on point-of-sale terminals, front or back of house computers, or other computers used in the Business.

4.12 Environmental Matters. Other than as set forth on Schedule 4.12, Sellers have not received written notice from any Governmental Authority or third party of any violation of any applicable environmental Laws with respect to the premises subject to the Real Property Leases which remains uncorrected, or of any obligation to undertake remediation with respect to such premises which remains unperformed.

4.13 Intellectual Property. Schedule 1.1(c) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets and all material IP Contracts. No such Intellectual Property has been licensed to any third party except as disclosed on Schedule 1.1(c). Except as disclosed on Schedule 1.1(c), there are no pending or, to Sellers' Knowledge, threatened claims, actions or proceedings challenging Sellers' ownership of, or alleging infringement by Sellers of, any such Intellectual Property.

4.14 Intellectual Property Non-Infringement. To Sellers' Knowledge, none of the use of the intellectual property included in the Purchased Assets, the conduct of the Business, nor any products sold or services provided in connection therewith, infringes upon or violates the intellectual property rights of any other Person, except as disclosed on Schedule 4.14.

4.15 Liquor Licenses. Schedule 1.1(h) sets forth a complete list of all licenses and permits regarding the sale of alcoholic beverages held by Sellers (the "**Liquor Licenses**"). To Sellers' Knowledge, each Seller is in material compliance with all Laws applicable to the sale of alcoholic beverages.

4.16 Reserved.

4.17 Compliance with Laws. To Sellers' Knowledge, the Business is conducted in all material respects in compliance with all applicable Laws and Orders; provided, however that Sellers' compliance with Immigration Laws is addressed solely in Section 4.22.

4.18 Brokerage. Except for the Hilco Fee, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Sellers that are or may be enforceable against Purchaser.

4.19 Reserved.

4.20 Assigned Agreements. (a) Schedule 1.1(a) lists all Contracts related to the Business, and Sellers have made or will make available to Purchaser true and complete copies of all such Contracts within 5 (5) days of the Schedule Delivery Date; (b) To Sellers' Knowledge, each Assigned Agreement is in full force and effect and is legal, valid and binding on the applicable Seller party thereto; (c) To Sellers' Knowledge, no Seller is in default under any Assigned Agreement, except as disclosed on Schedule 4.20 or as a result of filing the Bankruptcy Cases; (d) To Sellers' Knowledge, no counterparty has exercised or threatened any termination right under any Assigned Agreement; (e) Sellers have not received written notice of any material disputes from any counterparty to any Assigned Agreement; and (f) subject to entry of the Sale Order, the applicable Seller has the right to assume and assign each Assigned Agreement, free and clear of all Liens other than Permitted Liens.

4.21 Gift Cards. On and after the Execution Date, neither Seller nor any Person acting on behalf of, or at the direction of, any Seller has sold, issued or otherwise distributed any Gift Cards or any other type of gift certificate or other similar instrument or credit redeemable at any Restaurant. All Gift Cards issued prior the Execution Date were issued in a manner that permits electronic confirmation and verification of the amount of such gift cards.

4.22 Labor Matters. No Seller is party to or bound by any collective bargaining agreement covering any current or former employees. There is no ongoing strike, walkout, or other collective bargaining dispute with respect to any Seller. To Sellers' Knowledge, there is no organizational effort by any labor union with respect to any current employees of any Seller. Sellers have not received written notice from any Governmental Authority of any pending or

threatened audit, investigation, notice of inspection, or Form I-9 violation relating to the Business. Sellers have not been assessed any fine or penalty under 8 U.S.C. § 1324a with respect to the Business. To Sellers' Knowledge, no current employee of the Business has been the subject of a "no-match" letter, tentative nonconfirmation, or similar notice from a Governmental Authority regarding work authorization that remains unresolved.

4.23 Insurance. Insurance policies or binders of insurance or programs of self-insurance in the types and amounts listed on Schedule 4.23 are valid and currently in full force and effect. Schedule 4.23 sets forth all historic, occurrence-based policies in force by name of insurer, policy number, year, and limits of coverage. Sellers have paid, or caused to be paid, all premiums due under such policies and are not in default with respect to its obligations under any such policy. Sellers maintain, or are named or additional insureds under, insurance coverage with reputable insurers for the Business and each Seller and their respective properties and assets (including the Purchased Assets) of a type and in amounts typical of similar companies engaged in the respective businesses in which Sellers are engaged. No notice of cancellation or termination has been received with respect to any such policy and all such insurance policies are sufficient for compliance with all requirements of Law and of all agreements to which any Seller is a party or otherwise bound and are valid, outstanding, collectible, and enforceable policies, subject to any exception as could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect or prevent or materially delay the ability of any Seller to consummate the transactions contemplated hereby. No Seller has received written notice from any insurance company or board of fire underwriters of any defects or inadequacies that would materially adversely affect the insurability of, or cause any material increase in the premiums for, insurance covering the Business, any Purchased Asset, or any Seller or any of their respective properties or assets that have not been cured or repaired to the satisfaction of the party issuing the notice, except as could not have and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE V

## PURCHASER'S REPRESENTATIONS

Purchaser hereby represents and warrants to Sellers that the following are true and correct as of the Execution Date and as of the Closing:

5.1 Organization, Qualification. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and has all necessary power and authority to own and operate the Restaurants and to carry on the Business as it is now being conducted. Purchaser has all requisite power and authority to enter into this Agreement and carry out the transactions contemplated by this Agreement and all agreements, documents and instruments executed and delivered pursuant to or in accordance with this Agreement.

5.2 Authorization, Execution and Delivery. All necessary consents and approvals, including necessary consents and approvals from Governmental Authority, have been obtained by

Purchaser for the execution and delivery of this Agreement. The execution, delivery and performance of this Agreement and Ancillary Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary action. This Agreement is, and each of the other Ancillary Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

5.3 No Conflicts. The execution, delivery and performance of this Agreement and the Ancillary Documents by Purchaser do not and will not (i) conflict with or violate Purchaser's organizational documents, (ii) violate any applicable Law, Order, judgment or decree, or (iii) result in a breach of or constitute a default under any material Contract to which Purchaser is a party.

5.4 Litigation and Legal Proceedings. There is no outstanding judgment, order, writ, injunction, decree or award of any court, arbitrator, or Governmental Authority against Purchaser, and, to Purchaser's knowledge, there is no complaint, litigation, arbitration, investigation or other proceeding of or before any court, arbitrator or Governmental Authority pending, or threatened, against Purchaser or its assets which individually or in the aggregate, if adversely determined, could reasonably be expected to result in Purchaser's inability to perform its obligations under this Agreement and each of the other Ancillary Documents.

5.5 Brokerage. There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Purchaser that are or may be enforceable against Sellers or the Purchase Price.

5.6 Financing. Purchaser has cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Purchase Price, Cure Costs, and all other obligations under Section 1.3 at the Closing.

5.7 Good Faith. Purchaser has not engaged in any conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code or that would prevent Purchaser from being found to be a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, and Purchaser has not entered into any agreement or understanding with any other bidder or potential bidder with respect to the bidding for, or the purchase of, the Purchased Assets.

5.8 Non-Reliance. Purchaser has relied solely upon the representations and warranties expressly set forth in Article IV and its own independent investigation, and not upon any other statement, representation or information made or furnished by or on behalf of Sellers, in entering into this Agreement.

## ARTICLE VI

## "AS IS" ACKNOWLEDGMENT

Purchaser hereby acknowledges and agrees that, except as expressly provided in Article IV above, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets, Assumed Liabilities or the Assigned Agreements, including without limitation income to be derived or expenses to be incurred in conducting the Business or otherwise in connection with the Assumed Real Property Leases or the sufficiency of the term of the Assumed Real Property Leases or the obtainability of any consent or waiver required from any Person or Governmental Authority in connection with the operation of the Restaurants. Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets or the Assigned Agreements.

Purchaser further acknowledges that neither Sellers nor any Person acting on behalf of Sellers has made any representation or warranty with respect to any estimates, projections, forecasts or plans (including any information in the VDR or any confidential information memorandum) and that Purchaser has conducted its own independent analyses, estimates, projections, forecasts, and plans, and its own independent inspection and investigation of the physical condition of all portions of the Restaurants, Purchased Assets and the Assigned Agreements, and of all other matters relating to or affecting the Purchased Assets and the Assigned Agreements, as Purchaser deemed necessary or appropriate, and that in proceeding with its acquisition of the Purchased Assets and the Assigned Agreements, Purchaser is doing so in reliance on its own independent analyses, estimates, projections, forecasts, plans, inspections, and investigations. Purchaser hereby acknowledges and agrees that, subject to the finalization of the Schedules to this Agreement, it has completed all due diligence and investigation that is required by it to consummate all of the transactions required by this Agreement and that there is no further due diligence, financing or investigation contingency to the effectiveness of this Agreement.

Accordingly, at the Closing, Purchaser will accept the Purchased Assets and Assigned Agreements "AS IS," "WHERE IS," and "WITH ALL FAULTS." Purchaser, on behalf of itself and its Affiliates, hereby irrevocably waives and releases any claim or cause of action (whether in contract, tort or otherwise) against Sellers, their estates and their respective current and former officers, directors, managers, employees, advisors, professionals and agents (including any chief restructuring officer and its firm) arising out of or relating to the condition of the Purchased Assets, the contents of the VDR or the Bankruptcy Schedules, or the sale process, other than claims against Sellers for breach of an express covenant of this Agreement that survives the Closing or claims based on Fraud.

ARTICLE VII

## COVENANTS

7.1 Cooperation With Respect To Closing Conditions. Except where this Agreement expressly provides for a different standard, Purchaser and Sellers hereby covenant and agree to use commercially reasonable efforts to satisfy, or assist the other Party in satisfying, the closing conditions applicable to Purchaser in Article IX hereof and to Sellers in Article X hereof as soon as practicable after entry of the Sale Order. Sellers and Purchaser shall negotiate in good faith on the final form of all Ancillary Documents and to finalize the deliverables under Section 3.2 within 21 days of the Execution Date.

7.2 Best Efforts. Purchaser shall use commercially reasonable efforts to secure from applicable governmental and regulatory authorities all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses as may be required to close the transactions as contemplated by this Agreement, and to provide such other information and communications to Governmental Authorities as Sellers or such authorities may reasonably request.

7.3 Conduct Pending the Closing.

(a) From and after the date on which this Agreement becomes binding on Sellers pursuant to Section 12.22 until the Closing, except with the prior written approval of Purchaser or as may be required by the Bankruptcy Court, and subject to any limitations and restrictions created by the lack of available funds or the provisions of the Bankruptcy Code, Sellers shall: (i) operate the Restaurants only in, and shall not take any action except in, the ordinary course of business consistent with past practice, and consistent with such operation shall comply in all material respects with all applicable legal and contractual obligations; (ii) use commercially reasonable efforts to keep available the services of their employees and contractors; (iii) use commercially reasonable efforts to preserve the current relationships with employees, vendors and customers with whom Sellers have significant business relations relating to the Restaurants so as to preserve substantially intact the Business; (iv) not make any sale, assignment, transfer, abandonment, encumbrance or other conveyance of the Purchased Assets or any part thereof, except as permitted by subclause (i) above; (v) not make, enter into, modify, amend in any material respect or terminate any contracts or leases that are Purchased Assets or Assumed Liabilities; (vi) not allow any material intellectual property included in the Purchased Assets to lapse or be abandoned; (vii) not make any capital expenditures or renovations outside the ordinary course of business; (viii) not increase the compensation of any employee, adopt any new employee benefit plan, hire any individual with annual compensation exceeding $90,000, or enter into any labor or collective bargaining agreement; (ix) not take any action that would cause a default under any debtor-in-possession financing; (x) not, and shall not permit or authorize any other Person to, sell, issue or otherwise distribute any gift card, gift certificate or other similar instrument or credit redeemable at any Restaurant; and (xi) not permit any Lien on any Purchased Asset other than Permitted Liens and Liens existing as of the Petition Date or arising under any debtor-in-possession financing.. Without limiting the foregoing, Sellers shall keep, or cause to be kept, in full force and effect all insurance coverage existing on the Execution Date. Nothing in this Section

7.3 shall restrict Sellers from (A) rejecting, terminating or modifying any Contract that is not an Assigned Agreement or a Disputed Agreement, (B) closing or ceasing operations at any restaurant or location that is not a Restaurant, or (C) taking any action required or contemplated by the Bidding Procedures Order, the Sale Order or this Agreement.

(b) Real Property Lease Restrictions. From and after the date on which this Agreement becomes binding on Sellers pursuant to Section 12.22 until the Closing, without Purchaser's prior written consent: (i) Sellers shall not encumber any lease or leasehold estate included in the Purchased Assets, except for Permitted Liens; (ii) Sellers shall not renew any Real Property Lease or allow occupancy of any leased premises by any non-Seller party; and (iii) Sellers shall not terminate, amend, extend, renew, modify, breach or waive any right under any Real Property Lease or any Contract included in the Purchased Assets. Any action taken in violation of this Section 7.3(b) without Purchaser's prior written consent shall be null and void. Any request by Sellers for Purchaser's consent under this Section 7.3(b) shall be submitted in writing at least five (5) Business Days in advance of the proposed action and shall specify the proposed terms of such action in reasonable detail.

(c) Casualty. If, prior to the Closing, any of the Purchased Assets are damaged or destroyed by fire, earthquake, flood or other casualty (collectively, "**Casualty**"), Purchaser shall nonetheless be obligated to take title to the affected Purchased Assets at the Closing notwithstanding such Casualty, and such Casualty shall not excuse Purchaser's performance under this Agreement or give rise to a right to terminate; provided, however, that if the aggregate uninsured losses from all Casualties exceed $500,000, Purchaser shall have the right to terminate this Agreement upon written notice to Sellers and receive a return of the Deposit. At the Closing, Purchaser shall succeed to (i) the rights of the applicable Seller to any insurance or other proceeds payable on account of such Casualty ("**Casualty Proceeds**"), with a corresponding credit against the Purchase Price in the amount of any Casualty Proceeds actually received by the applicable Seller prior to Closing and not applied to repair or restoration, and (ii) the rights, if any, of the applicable Seller to settle, after the Closing, any loss under all policies of insurance applicable to such Casualty, including all rights to any related proofs of loss and assignments of claims, which Sellers shall assign to Purchaser at the Closing. Sellers shall cause their applicable Affiliates to reasonably cooperate in the adjustment and settlement of any such claim. Sellers shall not, and shall cause their Affiliates not to, settle any claim relating to a Casualty without Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed.

(d) Pre-Closing Access. From the date hereof until the Closing, Sellers shall afford Purchaser and its authorized representatives reasonable access during normal business hours to Sellers' officers, employees, corporate offices, Restaurants, properties, books, accounts, records and documents related to the Business, subject to the applicable confidentiality agreement and applicable Law.

(e) Seller Notification Obligations. From the date hereof until the Closing, Sellers shall promptly notify Purchaser in writing and deliver copies of: (a) any notice from any Person alleging that a consent is required in connection with the transactions contemplated by this Agreement; (b) any material written communication from any Governmental Authority, including

any approval or denial of any Liquor License application and any notice of condemnation or eminent domain affecting any Purchased Asset; (c) any notices of default under any DIP financing facility; or (d) the commencement of any action, suit, or proceeding relating to the Restaurants or the Purchased Assets.

7.4 Employment Matters.

(a) Within ten (10) days of the date hereof, Sellers shall make available to Purchaser a list of all Restaurant Employees.

(b) Subject to Purchaser's standard hiring and employment practices (including without limitation with respect to minimum qualifications for specific positions and standard pre-employment screenings), Purchaser shall have the right, but not the obligation, to offer employment to any or all of Sellers' employees at any Restaurants for which the associated Real Property Lease is an Assumed Real Property Lease as of the Closing (the "**Restaurant Employees**"), but excluding such employees identified on Schedule 7.4(b) (the "**Excluded Employees**"), with terms of employment at Purchaser's sole discretion, contingent on the Sale Order. Purchaser shall deliver to Sellers a written list of the Restaurant Employees it intends to hire no later than ten (10) calendar days prior to the Closing Date. The employees who accept such employment offers are referred to herein as "**Transferred Employees**." Purchaser shall use commercially reasonable efforts to offer employment to a sufficient number of Restaurant Employees, on terms sufficient, such that no "plant closing," "mass layoff," "relocation" or "employment loss" (as defined in the Worker Adjustment and Retraining Notification Act or any comparable state or local Law, including the New York Worker Adjustment and Retraining Notification Act (collectively, the "**WARN Act**")) occurs with respect to any Seller as a result of the transactions contemplated by this Agreement; provided, however, that Sellers shall be solely responsible for any WARN Act liabilities arising from Sellers' actions or omissions prior to the Closing. Purchaser shall make all offers of employment in compliance with applicable Law and shall be solely responsible for all onboarding, wage notices and employment eligibility verification with respect to Transferred Employees. At any Restaurant location that is a Designation Rights Asset as of the Closing, this Section 7.4, including the provisions relating to "Restaurant Employees" and "Transferred Employees," shall apply with respect to such location upon the effectiveness of the assumption and assignment of the applicable Assumed Real Property Lease, as if the effective date thereof were the Closing Date with respect to such location, and all employment-related costs at such location from and after the Closing Date shall be governed by Section 8.4(c). Sellers make no representation that any Restaurant Employee will accept employment with Purchaser, and nothing in this Section 7.4 shall confer any rights or remedies upon any Restaurant Employee or any other Person other than the Parties.

(c) Promptly after being selected as a Successful Bidder, Purchaser shall issue employment offers, conditional on the Closing, to Restaurant Employees in accordance with this Section 7.4. Effective as of the Closing, Sellers will terminate the employment of all Transferred Employees. Purchaser shall provide such time as may be reasonable under the circumstances between making the employment offer and the deadline for acceptance of employment. Employment offers may be mailed or transmitted via email where available and permitted by

applicable law. In addition to the foregoing, Purchaser may set up an employment portal to process applications and make offers of employment. The Parties shall cooperate in placing any information in the employment application or offer letter necessary to effectuate the hire of Sellers' employees.

(d) Pre-Closing Payroll Obligations. Except for the liabilities expressly assumed by Purchaser pursuant to Section 1.3(a)(x), Sellers shall pay, in the ordinary course and prior to or at Closing, all salary, wages, bonuses, paid time off, benefits, overtime and other compensation owed to Transferred Employees through the day prior to the Closing Date, and shall withhold and remit all applicable payroll taxes with respect to such compensation on or prior to Closing. Sellers shall remain solely liable for any workers' compensation claims arising from events occurring prior to the Closing Date.

7.5 Confidentiality.

(a) Pending the Closing, the Parties shall continue to be bound by any existing confidentiality agreement among themselves with respect to the transactions contemplated by this Agreement. To the extent not inconsistent with the foregoing, all information not disclosed to the general public by Sellers regarding the Business that is compiled by, obtained by, or furnished to Purchaser or any of its agents or employees in the course of its due diligence review of the Business is acknowledged to be confidential information, trade secrets and the exclusive property of Sellers, and all information not disclosed to the public by Purchaser regarding Purchaser's business or operations is acknowledged to be confidential information, trade secrets and the exclusive property of Purchaser (collectively, "**Confidential Information**"). Notwithstanding the foregoing, Confidential Information does not include information that (i) is at the time of disclosure or later becomes generally known to the public or within the industry or segment of the industry to which such information relates without violation by a Party of any of its obligations hereunder and not through any action by any of its directors, managers, officers, employees or agents which, if committed by such Party, would have constituted a violation by it of any of its obligations hereunder; (ii) at the time of disclosure to the other Party was already known by such other Party; or (iii) after the time of the disclosure to the other Party, is received by such Party from a third party which, to such Party's best knowledge, is under no confidentiality obligation with respect thereto.

(b) Neither Party may divulge, directly or indirectly, any Confidential Information of the other Party in any manner contrary to the interests of such Party, use or cause or suffer to be used any Confidential Information in competition with such Party, or use Confidential Information in violation of any applicable Law. Each of the Parties acknowledges that the breach or threatened breach of this provision would cause irreparable injury to the other Party that could not be adequately compensated by money damages. Accordingly, a Party may obtain a restraining order and/or injunction prohibiting a breach or threatened breach of this provision, in addition to any other legal or equitable remedies that may be available. If requested by legal process to disclose any Confidential Information of another Party, the Party in receipt of such request shall promptly give notice thereof to the other Party so that such Party may, at its own cost and expense, seek an appropriate protective order or, in the alternative, waive compliance to

the extent necessary to comply with such request if a protective order is not obtained. If a protective order or waiver is granted, the Party subject to such legal process may disclose the Confidential Information to the extent required by such court order or as may be permitted by such waiver. Notwithstanding any part of the foregoing, (i) each Party may disclose Confidential Information for the purpose of complying with court or government filing requirements, and (ii) Purchaser may use Sellers' employee information for the purpose of making employment offers and soliciting acceptances prior to the Closing.

(c) Public Announcements. Neither Party shall issue any press release or make any public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed); provided, however, that either Party may make any public disclosure it believes in good faith is required by applicable Law, in which case the disclosing Party shall use commercially reasonable efforts to provide the other Party with reasonable prior notice and an opportunity to review and comment on such disclosure. Promptly following the execution of this Agreement, the Parties may, upon mutual agreement, issue a mutually agreed press release announcing the execution hereof. Following the Closing, Purchaser may issue a press release announcing the consummation of the Sale Transaction. The Parties acknowledge that this Agreement will be filed with the Bankruptcy Court as part of the Bankruptcy Cases and that related filings shall not constitute a violation of this Section 7.5(c).

7.6 Sales and Transfer Taxes. All sales, use, excise, value-added, goods and services, transfer, recording, documentary, registration, conveyancing and similar taxes that may be imposed on the sale and transfer of the Purchased Assets (including any stamp, duty or other tax chargeable in respect of any instrument transferring property and any recording fees or expenses payable in connection with the sale and transfer of any intellectual property) and that are not exempt under 1146(a) of the Bankruptcy Code ("**Transfer Taxes**"), shall be paid by Purchaser. Purchaser and Sellers shall cooperate in timely making all filings, returns, reports and forms as may be required to comply with the provisions of applicable law in connection with the payment of any such taxes described in the immediately preceding sentence. Purchaser and Sellers will cooperate, as commercially reasonable, to (a) determine the amount of Transfer Taxes payable in connection with the transaction; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate Governmental Authority taxing authorities.

7.7 Bulk Sales. Purchaser hereby waives compliance by Sellers with the provisions of any so-called bulk transfer Laws of any jurisdiction in connection with the Sale Transaction.

7.8 Backup Bidder. Purchaser acknowledges and agrees that Sellers shall solicit other bids for the acquisition of some or all of the Purchased Assets, and the consummation of the sale transaction contemplated by this Agreement is subject to Sellers determining in their sole and absolute discretion that the offer represented by this Agreement is the highest or otherwise best offer for the Purchased Assets. Purchaser further acknowledges that, if other bids are received, Sellers may, in their sole and absolute discretion and in accordance with the Bidding Procedures Order, decide to conduct an auction (the "**Auction**") for the purpose of obtaining the highest or

otherwise best bid for the sale of the Purchased Assets and determining which bidder will be designated to be the purchaser of some or all of the Purchased Assets (the "**Successful Bidder**"). Purchaser agrees that the bid represented by this Agreement (as may be improved at such Auction) is a binding offer of Purchaser in such Auction. If Sellers determine that Purchaser is not the Successful Bidder but that Purchaser has submitted the next highest or otherwise best bid, then (x) Purchaser shall serve as the backup bidder (the "**Backup Bidder**") and its bid shall remain open and irrevocable until the Backup Bid Expiration Date; and (y) the Deposit shall continue to be held by the Escrow Agent until the Backup Bid Expiration Date and shall be returned to Purchaser within five (5) Business Days thereafter. If the Successful Bidder fails to consummate an approved sale because of a breach or other failure to perform, Sellers will be authorized, but not required, to consummate the sale with the Backup Bidder in accordance with the Bidding Procedures Order. If Sellers elect to consummate the Sale Transaction with Purchaser as the Backup Bidder, the Closing shall occur within ten (10) Business Days after Sellers' written notice to Purchaser of such election, and the dates set forth in Section 3.1 and Article XI shall be deemed adjusted accordingly.

7.9 Break-Up Fee; Expense Reimbursement. Because Purchaser is entering into this Agreement as Sellers' stalking horse bidder for the Purchased Assets, if Sellers consummate an Alternative Transaction with a Successful Bidder other than Purchaser, Sellers shall pay to Purchaser, as compensation for having acted as the stalking horse bidder and subject to entry of an order approving such protections (the "**Stalking Horse Order**"), (i) the Break-Up Fee, plus (ii) the Expense Reimbursement. The Break-Up Fee and Expense Reimbursement shall (A) be payable solely out of the proceeds of the Alternative Transaction, (B) constitute an allowed administrative expense claim against Sellers' estates pursuant to the Bidding Procedures Order, senior to the claims of other creditors against such proceeds, and (C) be paid to Purchaser within three (3) Business Days after the closing of the Alternative Transaction. The Break-Up Fee and Expense Reimbursement, together with the return of the Deposit, shall be Purchaser's sole and exclusive remedy against Sellers or their estates arising from Sellers' consummation of an Alternative Transaction. Seller shall use good faith, commercially reasonable efforts to promptly obtain entry of the Stalking Horse Order. The Parties agree that the Break-Up Fee and Expense Reimbursement are an integral part of the transactions contemplated by this Agreement and that, without these provisions, Purchaser would not have entered into this Agreement. Notwithstanding anything to the contrary herein, Purchaser and Sellers agree that, (x) so long as Sellers file a motion seeking entry of the Stalking Horse Order no later than Tuesday, September 22, 2026 and a hearing thereon no later than Friday, September 25, 2026, and otherwise use commercially reasonable efforts to obtain entry of the Stalking Horse Order on such timing, this Section 7.9 shall be deemed to have been satisfied for all purposes and (y) in the event Stalking Horse Order is not entered, Purchaser shall have the option to terminate this Agreement and in the event of such a termination, the Deposit shall be returned to Purchaser.

7.10 Schedule Delivery.

(a) Sellers shall prepare and cause to be delivered to Purchaser (i) all Schedules required under Article I (excluding Section 1.6 thereof) and Article IV of this Agreement in such form as is reasonably acceptable to Purchaser on or before the Schedule Delivery Date.

(b) IP Sellers shall prepare and cause to be delivered to Purchaser (i) all Schedules required under Section 1.6 of this Agreement in such form as is reasonably acceptable to Purchaser on or before the Schedule Delivery Date.

ARTICLE VIII

**REQUIRED APPROVALS**

8.1 Bankruptcy Court Approval. This Agreement is subject to and conditioned upon approval by the Bankruptcy Court. At Closing, Sellers will convey to Purchaser the Purchased Assets pursuant and subject to an Order, entered by the Bankruptcy Court approving the sale of the Purchased Assets, which order shall be in form and substance reasonably acceptable to Purchaser, and shall include the following provisions: (a) pursuant to section 363(f) of the Bankruptcy Code, the sale of the Purchased Assets shall be free and clear of all Interests (other than the Assumed Liabilities) to the extent such Interests have arisen, accrued or otherwise exist as of the Closing, including any Liabilities for sales, use, or similar Taxes of any Seller attributable to any period or portion thereof ending on or prior to the Closing Date, together with any interest, penalties, or additions to tax related thereto, whether or not then due, payable, assessed, or asserted and whether or not any Governmental Authority may seek to impose or collect any such Liabilities from Purchaser or with respect to any of the Purchased Assets following the Closing, in each case, to the greatest extent permitted by the Bankruptcy Code or applicable non-bankruptcy law; (b) Purchaser is a good faith purchaser entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code, (c) the consideration paid by Purchaser constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law; (d) the Sale Transaction was not the product of collusion among Purchaser and any other bidder or potential bidder and may not be avoided under section 363(n) of the Bankruptcy Code; (e) Purchaser shall have no liability or obligation with respect to any Excluded Liabilities and shall not be deemed a successor to, or a mere continuation of, any Seller or its estate under any theory of successor or transferee liability, de facto merger or otherwise, in each case, to the greatest extent permitted by the Bankruptcy Code or applicable non-bankruptcy law; (f) all Persons holding Interests in or against any Seller, the Purchased Assets or the Business, of any kind or nature whatsoever, arising prior to or subsequent to the commencement of the Bankruptcy Cases, are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against Purchaser, its Affiliates, successors or assigns, or the Purchased Assets, other than with respect to the Assumed Liabilities; and (g) the fourteen (14)-day stay periods set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure shall be waived, such that the sale order entered into pursuant to section 363 of the Bankruptcy Code (the "**Sale Order**") shall be effective immediately upon its entry and the transactions contemplated by this Agreement may be consummated immediately thereafter. The Parties shall work in good faith to promptly prepare a mutually acceptable form of Sale Order after the date hereof. Sellers will use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable.

8.2 Bankruptcy Filings. Sellers shall (A) reasonably cooperate with Purchaser concerning the Sale Order and any other orders of the Bankruptcy Court relating to the transactions

contemplated by this Agreement, (B) use commercially reasonable efforts to cause a hearing to consider approval of the transactions contemplated herein (the "**Sale Hearing**") to be held no later than October 21, 2026; and (C) use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the transactions contemplated by this Agreement, at least three (3) Business Days in advance of the proposed filing date so as to permit Purchaser sufficient time to review and comment on such drafts and, with respect to all provisions that materially impact Purchaser, such pleadings and proposed orders shall be reasonably acceptable to Purchaser and consistent with this Agreement. Sellers shall give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order.

8.3 Adequate Assurance. Purchaser covenants and agrees to provide the Bankruptcy Court and counterparties to Assigned Agreements with adequate assurance of Purchaser's prompt cure and future performance under such Assigned Agreement to the extent necessary as determined by the Bankruptcy Court. Notwithstanding anything to the contrary herein, Purchaser shall not have the right to disapprove the Sale Order or otherwise avoid consummating the transactions contemplated herein on account of a failure by Sellers to assume and assign any Assigned Agreement if such failure is attributable, in whole or in part, to a failure by Purchaser to fully cooperate in providing information or adequate assurances of Purchaser's prompt cure and future performance under such Assigned Agreement.

8.4 Required Consents; Transition Agreement.

(a) Notwithstanding anything to the contrary herein, if the transfer of any Purchased Asset to Purchaser is prohibited by applicable Law or Order, or would require a consent of a third party or Governmental Authority that is not overridden by the Sale Order and has not been obtained before the Closing, this Agreement shall not constitute a transfer or attempted transfer of that Purchased Asset. Failure to obtain such consent shall not be deemed a default by Sellers and, except where the failure to obtain such consent is as a result of any action or inaction of Sellers required under this Agreement, the failure to obtain such consent shall not result in any adjustment to the Purchase Price or Total Consideration. If the failure to obtain such consent is as a result of Sellers' failure to take any action or inaction of Sellers required under this Agreement, then the Purchase Price shall be equitably adjusted as agreed by the Parties or, if the Parties are unable to agree on such adjustment, Purchaser may elect to terminate this Agreement with a return of the Deposit.

(b) Transition of Operations. To the extent any Liquor License included in the Purchased Assets is not transferrable to Purchaser under applicable Law notwithstanding entry of the Sale Order:

(i) Election. Purchaser shall elect, in its sole discretion and at its sole risk, cost and expense, the method by which the operations of each Restaurant transition to Purchaser, which may include a transition services, interim management or other similar agreement with Sellers, the exercise of designation rights under Section 8.5, obtaining Purchaser's own licenses and permits, or any combination of the foregoing on a

Restaurant-by-Restaurant basis. Purchaser acknowledges that it is a sophisticated restaurant operator advised by its own counsel, that it selects the transition method at its sole risk, and that Sellers make no representation or warranty as to the permissibility of any transition arrangement under the New York Alcoholic Beverage Control Law or any other applicable Law. Nothing in this Agreement requires Sellers to take, or forbear from taking, any action that Sellers determine in good faith would violate applicable Law, and no such determination shall affect Purchaser's obligations hereunder.

(ii) Transition Agreement. At Purchaser's election, the Parties shall execute a transition services agreement (or interim management or other similar agreement), in form and substance reasonably acceptable to Purchaser and Sellers, regarding the post-Closing operation of the Restaurants pending issuance of Purchaser's own licenses and permits. Any such agreement shall terminate no later than the Transition Outside Date and shall require Purchaser to maintain liquor liability insurance naming Sellers as additional insureds and to bear all Liabilities arising during its term. Funding, cost responsibility and indemnification during the Transition Period are governed by Section 8.4(c), which for the avoidance of doubt extends to any and all losses, liabilities, damages, fines, penalties, costs, expenses and administrative claims arising from or relating to any transition arrangement, any Liquor License (including the loss, suspension or revocation thereof) or the purchase or sale of alcohol from and after the Closing Date. The Parties shall negotiate any such agreement in good faith. Purchaser shall deliver an initial draft to Sellers no later than two (2) days prior to the Closing, failing which Purchaser shall be deemed to have waived any requirement that such agreement be executed or delivered as a condition to the Closing. No such agreement shall impose obligations on Sellers materially beyond this Agreement, extend beyond the Transition Outside Date, or vary the funding, cost, indemnification or revenue provisions of Section 8.4(c).

(iii) Sale Order Provision. At Purchaser's request, Sellers shall use commercially reasonable efforts to seek to have included in the Sale Order a provision that, immediately upon the Closing, Purchaser shall be entitled to continue to sell alcoholic beverages at the Restaurants upon the same terms as Sellers until Purchaser obtains its own licenses or permits.

(iv) Designation Rights Fallback. If Purchaser has not obtained the Liquor License approvals necessary to sell alcohol at any Restaurant and applicable Law prohibits operation of such Restaurant pursuant to a transition arrangement, the Assigned Agreements and Purchased Assets relating to such Restaurant shall be deemed Designation Rights Assets at Closing under Section 8.5.

(v) Finality. The Closing shall occur and be fully effective notwithstanding any transition arrangement or Designation Rights Asset pending during the Transition Period, and no such pendency, and no failure to obtain, delay in obtaining, or loss of any license or permit, shall delay, condition or qualify the Closing, the transfer of the Purchased Assets, or the payment of the Purchase Price or any other amount payable hereunder, or give rise to any claim against Sellers or their estates.

(c) Post-Closing Costs; Purchaser Responsibility. From and after the Closing Date, as between Purchaser and Sellers, and regardless of which Person is the owner, operator, employer of record or licensee of record with respect to any Restaurant and regardless of the transition method elected by Purchaser pursuant to Section 8.4(b), Purchaser shall be solely responsible for any and all costs, expenses and Liabilities arising from or relating to the Restaurants, the Purchased Assets and the Designation Rights Assets, in each case attributable to the period from and after the Closing Date, including: (i) all rent, additional rent, real estate taxes, common charges, utilities and other occupancy and carrying costs; (ii) all wages, salaries, bonuses, commissions, benefits, severance, payroll taxes and other compensation and employment-related costs of all individuals employed or engaged at any Restaurant, whether employed by Purchaser, any Seller or any of their respective Affiliates; (iii) all premiums and other costs of insurance allocable to the Restaurants or the Purchased Assets, including the cost of renewal or replacement of any policies expiring on or after the Closing Date, and Purchaser shall, at its election, either fund the renewal of the existing policies (with Sellers and their applicable Affiliates continuing as named or additional insureds with respect to any location at which any Seller remains lessee, employer or licensee of record) or procure replacement coverage naming Sellers and such Affiliates as additional insureds, and Sellers shall, and shall cause their applicable Affiliates to, reasonably cooperate at Purchaser's sole cost in maintaining or renewing such policies; (iv) all sales, use and similar Taxes arising from the operation of the Restaurants from and after the Closing Date; and (v) all license and permit fees and all other costs of operating the Restaurants. Purchaser shall pay all such amounts directly to the applicable payee when due or, at Sellers' election with respect to any amount payable by a Seller (including payroll and sales Taxes), shall fund such amount to Sellers no later than two (2) Business Days prior to the date such amount is due, and shall reimburse Sellers for any other such amount paid by Sellers within three (3) Business Days after demand. Purchaser shall indemnify and hold harmless Sellers, their estates and their respective officers, directors, managers, employees and representatives from and against any and all losses, liabilities, obligations, damages, fines, penalties, Taxes, costs and expenses arising from or relating to any of the foregoing or from the post-Closing operation of any Restaurant, including any liability of any "responsible person" for sales or payroll Taxes attributable to post-Closing operations, other than to the extent resulting from the willful misconduct of Sellers. At any Restaurant location at which any Seller remains the operator of record from and after the Closing Date, Sellers shall use commercially reasonable efforts, at Purchaser's sole cost and expense, to operate such Restaurant in the ordinary course of business consistent with past practice, all revenues of such location shall be for the account of Purchaser, and the Parties shall settle all such revenues and all costs funded or borne by either Party on a net basis no less frequently than weekly. All transition arrangements under this Section 8.4 shall terminate, and all Designation Rights Assets shall have been designated or shall have lapsed in accordance with Section 8.5, no later than the Transition Outside Date.

8.5 Designation Rights.

(a) Notwithstanding anything to the contrary in this Agreement, Purchaser may, by written notice to Sellers no later than five (5) Business Days prior to the Closing, identify one or more Contracts (each, a "**Designation Rights Asset**") with respect to which Purchaser elects to defer its assumption and assignment determination. During the period commencing on the Closing

Date and ending on the Transition Outside Date (as such period may be shortened as provided in clause (e) below, the "**Designation Rights Period**"), Sellers shall not reject any Designation Rights Asset and shall use commercially reasonable efforts to keep each Designation Rights Asset in effect, pending Purchaser's election under clause (c) below. Notwithstanding the foregoing, Section 8.4(b) shall govern whether any Contracts for which Purchaser has not obtained the Liquor License approvals necessary to sell alcohol are deemed Designation Rights Assets at Closing.

(b) During the Designation Rights Period, responsibility for all costs, expenses and Liabilities attributable to each Designation Rights Asset and to the Restaurant to which it relates shall be governed by Section 8.4(c).

(c) At any time during the Designation Rights Period, Purchaser may, by written notice to Sellers, elect to designate any Designation Rights Asset for assumption and assignment to Purchaser or a third-party designee, in which case Sellers shall promptly seek entry of an order of the Bankruptcy Court authorizing such assumption and assignment pursuant to sections 363 and 365 of the Bankruptcy Code, subject to Purchaser's payment of the applicable Cure Costs and satisfaction of adequate assurance of future performance.

(d) Any Designation Rights Asset not designated by Purchaser for assumption and assignment prior to the expiration of the Designation Rights Period shall automatically be deemed an Excluded Asset and may be rejected or otherwise disposed of by Sellers in their discretion, and Purchaser shall have no further Liability with respect thereto other than Liabilities that accrued during the Designation Rights Period as provided in clause (b) above and Section 8.4(c). Purchaser shall, at its sole cost and within ten (10) days after a Designation Rights Asset becomes an Excluded Asset, remove all Purchased Assets from the applicable premises and shall be responsible for any damage caused by such removal; any Purchased Assets not so removed shall be deemed abandoned to Sellers, who may dispose of them without liability to Purchaser.

(e) The Designation Rights Period for any Designation Rights Asset that is an unexpired lease of nonresidential real property shall not extend beyond the deadline for assumption of such lease under section 365(d)(4) of the Bankruptcy Code, as such deadline may be extended by the Bankruptcy Court. At Purchaser's request and at Purchaser's sole cost and expense, Sellers shall use commercially reasonable efforts to seek such extensions of such deadline as Purchaser may reasonably request.

## ARTICLE IX

## <u>CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS</u>

The obligations of Purchaser under this Agreement to consummate the transactions contemplated herein are subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

9.1 <u>Accuracy</u>. Each of the representations and warranties made by Sellers shall be true and correct in all respects on and as of the date hereof (unless such representation or warranty is

given as of a particular date in which case such representation or warranty will be considered only as of such particular date), and in all material respects as of the Closing Date.

9.2 Performance. Sellers shall have in all material respects performed or complied with each and all of the obligations, covenants, and agreements required to be performed or complied with by them under this Agreement and any Ancillary Document on or prior to the Closing.

9.3 Deliverables. (a) Sellers shall have delivered to Purchaser executed counterparts of all documents required under Section 3.2 and any other Ancillary Documents and (b) Sellers and IP Sellers shall have delivered all Schedules by the Schedule Delivery Date.

9.4 No Material Adverse Effect. Since the Execution Date, no Material Adverse Effect shall have occurred.

9.5 Sale Order; No Injunction. The Sale Order shall have been entered by the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser, shall not be subject to any stay as of the Closing, and shall either (a) have become final and non-appealable or (b) expressly waive the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h). No Governmental Authority shall have issued, enacted, entered, promulgated or enforced any Law or Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and there shall be no proceeding pending by any Governmental Authority seeking any such Order.

9.6 Assignment Order. The Bankruptcy Court shall have entered an order (which may be the Sale Order) that will (i) authorize the assumption by Sellers and assignment to Purchaser of the Assigned Agreements (including any additional Assigned Agreements designated by Purchaser after the Closing in accordance with this Agreement), (ii) establish the Cure Costs relating to the Assigned Agreements, and (iii) provide that Purchaser has demonstrated adequate assurance of future performance under the Assigned Agreements (or that such determination with respect to a Designation Rights Asset is to be made in connection with its designation in accordance with Section 8.5(c)), and such order shall be in full force and effect and not subject to any stay.

ARTICLE X

**CONDITIONS PRECEDENT TO SELLERS' OBLIGATIONS**

The obligations of Sellers under this Agreement to consummate the transactions contemplated herein are subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Sellers:

10.1 Accuracy. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date.

10.2 Performance. Purchaser shall have in all material respects performed or complied with each and all of the obligations, covenants, and agreements required to be performed or complied with by it under this Agreement and any Ancillary Document by or prior to the Closing.

10.3 Deliverables. Purchaser shall have delivered to Sellers executed counterparts of all documents required under Section 3.2 and any other Ancillary Documents.

10.4 Sale Order; No Injunction. The Sale Order shall have been entered by the Bankruptcy Court, in form and substance reasonably acceptable to Sellers, and shall not be subject to any stay as of the Closing. No Governmental Authority shall have issued, enacted, entered, promulgated or enforced any Law or Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and there shall be no proceeding pending by any Governmental Authority seeking any such Order.

ARTICLE XI

**TERMINATION**

11.1 Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned, upon written notice given to the other Party hereto, at any time prior to the Closing as follows:

(a) by mutual written consent of Sellers and Purchaser;

(b) by Purchaser or by Sellers, if: (i) there shall be any Law or Order that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited, provided that the Party seeking to terminate this Agreement (and its Affiliates) shall have used commercially reasonable efforts to have any such law or order declared invalid, inapplicable or otherwise vacated; (ii) the Closing shall not have occurred within 10 Business Days after the date on which all conditions to Closing set forth in Article IX and Article X have been satisfied or waived, or (iii) the Closing fails to occur within 60 days after entry of the Sale Order, *provided* that the Agreement may not be terminated pursuant to this subsection by Purchaser if it is in material breach of this Agreement or by Sellers if any Seller is in material breach of this Agreement;

(c) by Sellers, if Purchaser breaches any of its covenants, representations or warranties in this Agreement, and such breach (i) would (if occurring or continuing as of the Closing) give rise to the failure of a condition to the Closing set forth in Article X to be satisfied and (ii) is not curable or, if curable, is not cured by the 10th Business Day after written notice thereof is given by Sellers to Purchaser, provided that Sellers may not terminate this Agreement pursuant to this provision if any Seller is in material breach of this Agreement;

(d) by Purchaser:

(i) if Sellers breach any of their covenants, representations or warranties in this Agreement, and such breach (x) would (if occurring or continuing as of the Closing) give rise

to the failure of a condition to the Closing set forth in Article IX to be satisfied and (y) is not curable or, if curable, is not cured by the 10th Business Day after written notice thereof is given by Purchaser to Sellers, provided that Purchaser may not terminate this Agreement pursuant to this provision if Purchaser is in material breach of this Agreement;

(ii) if, at any time prior to the Closing, the Bankruptcy Cases are dismissed, or are converted to cases under chapter 7 of the Bankruptcy Code and the chapter 7 trustee has not, within five (5) Business Days after appointment, delivered written notice to Purchaser of the trustee's election to consummate the Sale Transaction in accordance with this Agreement;

(iii) if the Sale Order has not been entered by the Bankruptcy Court by October 24, 2026 (or such later date as the Parties may agree in writing), or if after entry the Sale Order is reversed, vacated or modified in a manner not reasonably acceptable to Purchaser, in either case other than as a result of any breach of this Agreement by Purchaser or any failure by Purchaser to cooperate as required hereby;

(e) by Purchaser or Sellers: (i) if there is an Auction and Sellers do not designate Purchaser as the Successful Bidder or the Backup Bidder at the conclusion of the Auction in accordance with the Bidding Procedures Order; (ii) if Sellers enter into a definitive agreement providing for an Alternative Transaction other than the Successful Bidder at an Auction; or (iii) upon the consummation of an Alternative Transaction;.

(f) by Sellers, immediately upon written notice to Purchaser and without any cure period, if Purchaser fails to deliver any required increase in the Deposit when required by Section 2.2(a); or

(g) by Purchaser or by Sellers, if the Closing shall not have occurred on or prior to the date that is 90 days following the Execution Date (the "**Outside Date**"); provided that the right to terminate this Agreement pursuant to this Section 11.1(g) shall not be available to any Party whose breach of this Agreement has been the primary cause of, or resulted in, the failure of the Closing to occur by the Outside Date.

Notwithstanding anything to the contrary in this Section 11.1, this Agreement may not be terminated by any Party from and after the occurrence of the Closing.

11.2 Effect of Termination.

(a) In the event that this Agreement is terminated pursuant to Section 11.1, this Agreement and the rights and obligations of the Parties hereunder shall immediately become null and void and of no further force or effect without any further action by any Party; provided that the provisions of this Section 11.2 and of Sections 2.2, 2.3, 7.5 and 7.9, and Article XII shall survive any such termination. Except as expressly provided in Section 7.9 (Break-Up Fee; Expense Reimbursement), Purchaser shall not be entitled to any bid protection, or to any claim against Sellers or their estates in connection with this Agreement or its termination, other than return of the Deposit as provided in Section 2.2 and the Break-Up Fee and Expense Reimbursement provided in Section 7.9.

(b) If this Agreement is terminated pursuant to Section 11.1 for any reason other than by Sellers pursuant to Section 11.1(c), then within two (2) Business Days after such termination, the Deposit will be returned to Purchaser without interest. If this Agreement is terminated by Sellers pursuant to Section 11.1(c), the Deposit shall be delivered by the Escrow Agent to Sellers within two (2) Business Days after such termination.

(c) If this Agreement is terminated pursuant to Section 11.1(e), then, (i) the Deposit will be returned to Purchaser without interest; and (ii) subject entry of the Stalking Horse Order, Sellers will pay to Purchaser the Break-Up Fee and Expense Reimbursement. Any payment of the Break-Up Fee and Expense Reimbursement under this Section 11.2 will be made by Sellers from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Purchaser upon the closing of such Alternative Transaction. Sellers acknowledge that the Break-Up Fee and the Expense Reimbursement (or any portion thereof) are necessary and appropriate expenses for the administration of their estates, pursuant to Sections 503 and 507 of the Bankruptcy Code, and that the Break-Up Fee and Expense Reimbursement (or any portion thereof) are allowed administrative expenses.

## ARTICLE XII

## MISCELLANEOUS

12.1 Time is of the Essence. Time is of the essence for all dates and time periods set forth in this Agreement and for all performance called for in this Agreement.

12.2 Further Assurances. Each of the Parties and each IP Seller shall, from time to time after the Closing Date, upon the reasonable request of the other Party and at the expense of such requesting Party, duly execute, acknowledge and deliver all such further instruments and documents reasonably required to further effectuate the interests and purposes of this Agreement. The Parties agree to assist one another in good faith with respect to the transition of the Purchased Assets to Purchaser. From and after the Closing Date, Sellers shall cooperate with Purchaser and promptly sign and deliver to Purchaser any and such additional documents, instruments, endorsements and related information and take actions as Purchaser may reasonably request, for the purpose of effecting the transfer of the Purchased Assets to Purchaser and/or carrying out the provisions of this Agreement. Such efforts and assistance shall be at the cost of the requesting Party and, except to the extent that Sellers or Purchaser may be expressly required to do so pursuant to another provision hereof, the foregoing shall not be construed to require a Party of whom any request is made pursuant to this Section 12.2 to (i) incur any liability, (ii) join in or pursue any action or proceeding, or (iii) incur any cost or expense whatsoever.

12.3 Post-Closing Name Change. Within 60 days after the Closing Date, Sellers shall take all necessary steps to remove “Bond 45”, “Café Fiorello”, and “Trattoria Dell’Arte” from their corporate names, including filing required documents (if any) with the Bankruptcy Court and applicable Governmental Authorities; provided that, as to any Seller that remains a licensee or operator of record at any Restaurant during the Transition Period, such obligation shall instead apply within ten (10) days after the earlier of (x) the date on which Purchaser or its Designee holds

all licenses required for the operation of each such Restaurant and (y) the Transition Outside Date. As to each Restaurant, upon Purchaser or its Designee taking operational control of such Restaurant (and in all events by the Transition Outside Date), Sellers shall cease use of any service marks, trademarks, trade names, logos, or other Intellectual Property Rights transferred to Purchaser as part of the Purchased Assets, and shall cease holding themselves out as affiliated with the Business. During the Transition Period, Sellers may use such Intellectual Property Rights, on a royalty-free basis, solely as necessary to operate any Restaurant at which any Seller remains the operator of record pursuant to Section 8.4 or Section 8.5.

12.4 Notices. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when (a) delivered personally, on the date of personal delivery; (b) sent by facsimile or email transmission, on the date of transmission (provided no bounce-back or error message is received); (c) sent by recognized overnight courier service, on the day after deposit with such courier; or (d) sent by registered or certified mail, return receipt requested and postage prepaid, on the fifth (5th) day after mailing, to the following addresses; provided that notices must also be provided by electronic mail to the addresses set forth below. Any Party may change its notice information by written notice to the other Party in accordance with this Section 12.4:

To Purchaser:

FHG Acquisition, LLC
c/o Fertitta Entertainment
1150 West Loop South
Houston, Texas 77027

Sscheinthal@ldry.com

with a copy (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Attn: Craig Grear and Michael Nestor
1000 N. King Street
Wilmington, DE 19801
mnestor@ycst.com
cgrear@ycst.com

To Sellers or IP Sellers:

The Fireman Group
Attn: Jordan Meyers
c/o SierraConstellation Partners, LLC
101 Creekside Crossing, Suite 1700-388
Brentwood, TN 37027
jmeyers@scpllc.com

with a copy (which shall not constitute notice) to:

Raines Feldman Littrell LLP
1900 Avenue of the Stars, 19th Floor
Los Angeles, CA 90067
hrafatjoo@raineslaw.com
dforsh@raineslaw.com

12.5 Expenses. Except to the extent otherwise expressly provided herein, each Party hereto shall pay all of its own costs and expenses (including without limitation any fees or expenses of attorneys, accountants, brokers or investment bankers) in connection with the negotiation and execution of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

12.6 Privacy. Any personally identifiable information of customers or consumers included in the Purchased Assets shall be transferred to Purchaser only to the extent permitted by section 363(b)(1) of the Bankruptcy Code and applicable Law and, if a consumer privacy ombudsman is appointed in the Bankruptcy Cases, subject to any findings or conditions imposed by the Bankruptcy Court in connection therewith. Sellers make no representation or warranty as to the transferability of any such information.

12.7 Post-Closing Access. Until the earlier of (x) 2 years after the Closing and (y) closing of the Bankruptcy Cases, Purchaser shall give Sellers and their counsel and other professionals, and the counsel and professionals of any successor to Sellers (collectively, "**Permitted Access Parties**"), reasonable access to the books and records relating to the Purchased Assets or the Business. The Permitted Access Parties may copy such records at their own expense, and Purchaser shall copy and deliver records on a reasonably detailed written request and reimbursement of its reasonable costs. Purchaser shall also provide the Permitted Access Parties, at no cost, reasonable access during business hours on at least 24 hours' notice to assist in their post-Closing activities (including tax return preparation), provided that such access does not materially interfere with Purchaser's operations.

12.8 Receipt Forwarding. From and after the Closing, (a) each Seller shall promptly forward to Purchaser any payments or proceeds received by such Seller that constitute Purchased Assets, and (b) Purchaser shall promptly forward to the applicable Seller any payments or proceeds received by Purchaser that constitute Excluded Assets.

12.9 Post-Closing Payments. Each Seller agrees that any funds received after the Closing Date with respect to credit card payments or any other Purchased Asset received by any Seller after the Closing Date shall be held in trust by such Seller for Purchaser's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Purchaser or its designee the amount of such payments. In addition, Purchaser agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Purchaser or its Affiliates, any cash, checks with appropriate endorsements, or other property that Purchaser or its

Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

12.10 Assignment. Purchaser shall have the right to (a) assign all or any portion of its rights hereunder to one or more Affiliates or third party designees without the consent of Sellers, or (b) elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Affiliates or third party designees as may be designated by Purchaser in writing to Sellers at least three (3) Business Days prior to the Closing; provided, however, Purchaser shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment or election. Purchaser shall be entitled to designate, in writing to Sellers at least three (3) Business Days prior to the Closing, one or more of its Affiliates to (a) purchase or take title to specified Purchased Assets and/or (b) assume specified Assumed Liabilities (any such Affiliate of Purchaser, a "**Designee**"), provided that (x) any such Designee assumes all obligations with respect to any such specified Purchased Asset or Assumed Liability to the same extent as Purchaser hereunder and (y) no such designation of or assumption by a Designee shall relieve Purchaser of any of its obligations hereunder. All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. Notwithstanding the foregoing, Sellers may, without Purchaser's consent, assign any or all of their rights and obligations hereunder to any successor to Sellers or their estates, including any liquidating trust, plan administrator or trustee appointed in the Bankruptcy Cases, and any such successor shall be entitled to enforce such rights directly against Purchaser; provided that no such assignment shall relieve Sellers of their obligations hereunder unless the assignee expressly assumes such obligations in writing. The covenants set forth in this Section 12.10 shall survive the Closing.

12.11 Specific Performance. Each of the Parties recognizes that if the other Party breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate the non-breaching party for its injuries. Sellers and Purchaser shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of this Agreement. The Parties further agree that neither Party shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to herein, and each Party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument. If any action is brought by Sellers or Purchaser to enforce this Agreement, the non-breaching party shall waive the defense that there is adequate remedy at Law.

12.12 No Survival. Notwithstanding anything to the contrary herein (including Section 11.2), none of the representations and warranties of each Seller and of Purchaser made in this Agreement or in any certificate delivered hereunder will survive the Closing Date, and all of such representations and warranties will be extinguished by the Closing, such that no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or otherwise, at law or in equity) may be brought with respect thereto after the Closing, other than claims based on Fraud. Subject to Sellers' obligations under Sections 8.4 and 8.5 during the Transition Period, nothing in this Agreement shall prohibit any Seller from ceasing

operations, winding up its affairs, dissolving or consummating a chapter 11 plan following the Closing.

12.13 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without application of principles of conflict of laws), except to the extent superseded by the Bankruptcy Code or other applicable federal law. In connection with any controversy arising out of or related to this Agreement, Sellers and Purchaser hereby irrevocably consent to the jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the courts of the State of New York. Sellers and Purchaser irrevocably consent to service of process out of the aforementioned courts and waive any objection which they may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in such courts.

12.14 Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any Party.

12.15 Section Headings. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

12.16 Interpretation. Each Party confirms that it and its respective counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to," (c) all references to the singular shall include the plural and vice versa, where applicable, and (d) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

12.17 No Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the Parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement.

12.18 Waiver of Jury Trial. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.19 Amendments; Waiver. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the Parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any Party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the Parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

12.20 Entire Agreement. This Agreement and the Ancillary Documents contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way.

12.21 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement. Facsimile and electronically transmitted signatures shall be deemed original signatures.

12.22 Effectiveness; Irrevocable Offer. Purchaser's execution and delivery of this Agreement constitutes an irrevocable offer by Purchaser that shall remain open through the period required by the Bidding Procedures and, if Purchaser is designated the Backup Bidder, through the Backup Bid Expiration Date; provided, however, that if Sellers have not filed with the Bankruptcy Court a motion seeking entry of the Stalking Horse Order on or before September 22, 2026, then at any time thereafter and prior to the filing of such motion, Purchaser may revoke its offer and terminate this Agreement by written notice to Sellers, whereupon (i) this Agreement shall be of no further force or effect, without liability of any Party or of any IP Seller, and (ii) the Deposit shall be returned to Purchaser within two (2) Business Days after such notice, and Sellers shall promptly join Purchaser in so instructing the Escrow Agent, which obligation shall bind Sellers from the Execution Date notwithstanding the second sentence of this Section 12.22. Notwithstanding anything to the contrary herein, this Agreement shall not be binding on Sellers, and Sellers shall have no obligation hereunder, unless and until (a) the Bankruptcy Court has entered the Sale Order approving this Agreement and (b) Sellers have executed and delivered a counterpart of this Agreement.

12.23 Limitation of Liability; Non-Recourse. (a) Notwithstanding anything to the contrary herein, prior to the Closing, Purchaser's sole remedies against Sellers and IP Sellers shall be return of the Deposit as provided in Section 2.2, payment of the Break-Up Fee and Expense Reimbursement as provided in Section 11.2 (if applicable), and specific performance under Section 12.11, and Sellers and IP Sellers shall have no monetary liability to Purchaser in excess of the Deposit and any Break-Up Fee and Expense Reimbursement payable hereunder. From and after the Closing, Sellers and IP Sellers shall be liable to Purchaser for direct damages arising from any breach by Sellers and IP Sellers of any covenant or agreement of Sellers or IP Sellers that by its terms contemplates performance after the Closing, and Purchaser may seek specific performance thereof under Section 12.11. In no event shall Sellers or IP Sellers have any liability for consequential, special or punitive damages or lost profits. Nothing in this Section 12.23(a) shall

limit any claim based on Fraud. (b) No past, present or future director, officer, manager, employee, equity holder, advisor, professional or agent of any Seller (including any chief restructuring officer and its firm) shall have any liability for any obligation of Sellers under this Agreement, and Purchaser hereby waives and releases any such claim.

12.24 Disclosure Schedules.

(a) All capitalized terms not defined in the disclosure schedules shall have the meaning ascribed to such terms in this Agreement. The representations and warranties of Sellers and IP Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the disclosure schedules. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers or IP Sellers. No disclosure in the disclosure schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the disclosure schedules be deemed or interpreted to expand the scope of Sellers' and IP Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the disclosure schedules are incorporated by reference into the applicable disclosure schedule in which they are directly or indirectly referenced. Any matter disclosed in any disclosure schedule shall be considered disclosed with respect to each other disclosure schedule solely to which it is reasonably apparent on the face of such disclosure that such matter would pertain, without reference to any document referenced in such disclosure.

(b) The Parties and IP Sellers shall use good faith, commercially reasonable efforts to give effect to the transactions contemplated hereunder by updating or delivering supplemented, revised or additional schedules to this Agreement as reasonably requested by either Party or IP Sellers. Any schedule so updated, supplemented, revised or delivered shall be deemed incorporated in this Agreement; provided, however, that any such updated schedule shall qualify the representations and warranties herein only as of the date of delivery of such update, and shall not be deemed to qualify such representations and warranties as of the Schedule Delivery Date; provided, further, that if any such update discloses facts that individually or in the aggregate would constitute a Material Adverse Effect, such update shall not be deemed to cure any breach of the applicable representation or warranty for purposes of Article IX. For the avoidance of doubt, the execution, delivery and effectiveness of this Agreement, and the irrevocability of Purchaser's offer under Section 12.22, are not subject to or conditioned upon any such update or delivery of supplemented, revised or additional schedules.

*[signature page follows ]*

IN WITNESS WHEREOF, each of the Parties hereto, and the IP Seller, has caused this Agreement to be duly executed as of the Execution Date.

**PURCHASER:**

**FHG ACQUISITION, LLC**

By: ________________________________
Name: Steven L. Scheinthal
Title: Vice President

**SELLERS:**

**BROADWAY HOSPITALITY VENTURE, LLC**
**CIELI PARTNERS, L.P.**
**FIORELLO'S ROMAN CAFE, INC.**
**BRASSERIE 57 LLC**
**BROOKLYN DINER USA, INC.**
**BROOKLYN DINER USA, L.P.**
**ITALIAN CAFE CONCEPTS, LLC**
**CAFE CONCEPTS (WASHINGTON DC), LLC**
**EBBETS FIELD VENTURE, LLC**
**EBBETS FIELD VENTURE II, LLC**
**THE FINER DINER, LLC**
**THE FIREMAN GROUP CAFE CONCEPTS, INC.**
**RED EYE GRILL, L.P.**

By: ________________________________
Jordan Meyers
Chief Restructuring Officer

**IP SELLERS:**

**SMJ GROUP, INC.**
**SMJ GROUP, L.L.C.**
**SFAP GROUP, LLC**
**S.M.F. GROUP INC.**
*solely with respect to Section 1.6*

By: ________________________________
Jordan Meyers
Chief Restructuring Officer

# ANNEX I

## TABLE OF ADDITIONAL DEFINITIONS

"**Alternative Transaction**" means any transaction or series of transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all of the Business or Purchased Assets to one or more Persons other than Purchaser.

"**Affiliate**" means, as to any Person, any other Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by Contract or otherwise.

"**Avoidance Actions**" means all avoidance claims and causes of action under Sections 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code, together with any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds thereof.

"**Backup Bid Expiration Date**" means the date on which the bid of the Backup Bidder expires under the Bidding Procedures or, if the Bidding Procedures do not specify such a date, the earlier of (a) the closing of the Alternative Transaction and (b) the date that is forty-five (45) days after entry of the order of the Bankruptcy Court approving the Alternative Transaction, as such date may be extended with the written consent of Purchaser.

"**Bid Deadline**" has the meaning set forth in the Bidding Procedures.

"**Bidding Procedures**" means the bidding procedures approved by the Bidding Procedures Order, as the same may be amended, supplemented or modified in accordance with their terms.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court [Docket No. 104] approving, among other things, the Bidding Procedures, as the same may be amended, supplemented or modified.

"**Break-Up Fee**" means an amount equal to 2.8% of the Base Purchase Price, payable to Purchaser in accordance with Section 11.2(c) and the Bidding Procedures Order.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York are authorized or required by Law to be closed.

"**Claim**" has the meaning ascribed by section 101(5) of the Bankruptcy Code.

"**COBRA**" means Part 6 of Subtitle B of Title I of ERISA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Continuing Restaurant**" means any of Sellers' restaurant locations with respect to which the associated leases have been designated by Purchaser as Assigned Agreements or Designation Rights Assets.

"**Contract**" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable law.

"**Corporate Level**" means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, liabilities or other operational activities or items conducted or owned by Sellers primarily for the collective benefit of all restaurant locations and their employees, including, but not limited to, all Sellers' Employee Benefit Plans, if any, and all liabilities and obligations of Sellers thereunder.

"**Covered Restaurant**" means each of the following Restaurants, in each case without regard to whether the Real Property Lease for such Restaurant is or becomes an Assigned Agreement, an Assumed Real Property Lease, a Designation Rights Asset or an Excluded Asset at the Closing or at any time thereafter: (i) Brasserie 57 LLC d/b/a Paris Bar and Le Jardin, 120 W. 57th Street, New York, NY 10019; (ii) Broadway Hospitality Venture, LLC d/b/a Bond 45, 221 W. 46th Street, New York, NY 10036; (iii) Brooklyn Diner USA, L.P. d/b/a Brooklyn Diner, 212 W. 57th Street, New York, NY 10019; (iv) Cafe Concepts (Washington DC), LLC d/b/a Café Fiorello, 1001 Pennsylvania Ave. NW, Washington, DC 20004; (v) Cieli Partners, L.P. d/b/a Trattoria Dell'Arte, 900 7th Avenue, New York, NY 10106; (vi) Ebbets Field Venture, LLC d/b/a USA Brooklyn Delicatessen, 200 W. 57th Street, New York, NY 10019; (vii) Fiorello's Roman Cafe, Inc. d/b/a Café Fiorello, 1900 Broadway, New York, NY 10023; (viii) Italian Cafe Concepts, LLC d/b/a Café Paradiso, 144 W. 65th Street, New York, NY 10023; and (ix) The Finer Diner, LLC d/b/a Brooklyn Diner, 155 W. 43rd Street, New York, NY 10036.

"**Cure Costs**" means all amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code to cure any defaults under an Assigned Agreement as a condition to its assumption and assignment to Purchaser, as agreed by the applicable counterparty or determined by the Bankruptcy Court.

"**Employee Benefit Plans**" means all employee benefit plans (as defined in Section 3(3) of ERISA) and all other material employee benefit arrangements or payroll practices maintained, sponsored, or contributed to by Sellers or any of Sellers' ERISA Affiliates, or with respect to which Sellers have any Liability.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b),(c), (m) or (o) of the Code or Section 4001(b)(l) of ERISA that includes the first entity, trade or business, or that is a

member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"**Expense Reimbursement**" means the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of legal counsel, financial advisors and other professionals) actually incurred by Purchaser in connection with the negotiation, documentation and pursuit of the transactions contemplated by this Agreement, in an aggregate amount not to exceed $50,000.00, payable to Purchaser in accordance with Section 11.2(c) and the Bidding Procedures Order.

"**Fraud**" means a claim by a Party against another Party for actual and intentional fraud with respect to the making of the representations and warranties set forth in Article IV (in the case of representations and warranties made by Sellers) or Article V (in the case of representations and warranties made by Purchaser); provided that actual and intentional fraud shall be deemed to exist only if a court of competent jurisdiction finally determines that the applicable Party made a knowing and intentional misrepresentation of a material fact in such Article IV or Article V representations and warranties, with the intent that the other Party rely thereon, coupled with damages caused by such other Party's detrimental reliance thereon, under circumstances constituting common law fraud.

"**Gift Cards**" means any gift card, gift certificate, or other similar instrument or credit redeemable for the purchase of goods at any Restaurant issued in a form that permits electronic confirmation and verification of the outstanding dollar amount of such gift card, gift certificate, or other instrument or credit.

"**Governmental Authority**" means any federal, state, provincial, or municipal authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"**Headquarters Employees**" means those individuals employed at the leased premises by Sellers and located at 810 Seventh Avenue, 6th Floor, New York, New York.

"**Hilco Fee**" means an amount not to exceed an amount equal to four percent (4%) of the sum of the Base Purchase Price and any other Assumed Liabilities, provided, however, that for purposes of calculation of the Hilco Fee the amount of the Hilco Fee shall be excluded from the amount of Assumed Liabilities.

"**Immigration Laws**" means the Immigration Reform and Control Act of 1986, as amended, including 8 U.S.C. § 1324a and § 1324b, the regulations promulgated thereunder (including 8 C.F.R. Part 274a), and any other federal, state, or local Law relating to the employment eligibility verification, work authorization, or immigration status of employees.

"**Interests**" means any legal, equitable, contractual interests, Liens, Liabilities, or other Claims or rights of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, including

without limitation any Claims under a theory of successor liability or similar doctrine, of any Person.

"**Intellectual Property Rights**" means any and all intellectual property and proprietary rights of any kind or nature throughout the world, whether registered or unregistered, including: (a) patents, patent applications, invention disclosures and all continuations, continuations-in-part, divisionals, reissues, reexaminations, extensions, renewals and foreign counterparts thereof; (b) trademarks, service marks, trade names, trade dress, logos, corporate names, brand names, domain names, social media identifiers, and all registrations, applications, renewals and goodwill associated therewith; (c) copyrights, copyrightable works, software, databases, data compilations, website content, documentation, manuals, marketing materials and all registrations and applications relating thereto; (d) trade secrets, know-how, proprietary information, confidential information, inventions, discoveries, processes, methodologies, techniques, specifications, business methods, customer lists, supplier information and other confidential or proprietary rights and information; (e) rights in software, source code, object code, firmware, algorithms, application programming interfaces, architecture, development tools and related documentation; (f) rights of publicity, moral rights and all similar or equivalent proprietary rights recognized under applicable Law; (g) internet and digital rights, including domain names, websites, URLs, social media accounts and handles; and (h) all causes of action, claims, rights to sue, rights to recover damages, proceeds and remedies arising from the past, present or future infringement, misappropriation or violation of any of the foregoing.

"**Liability**" means any liability, indebtedness, obligation, expense, Claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"**Law**" means any statute, law, ordinance, ruling, policy, rule or regulation of any Governmental Authority and all judicial or administrative interpretations thereof and any common law doctrine.

"**Lien**" means any lien, hypothecation, encumbrance, claim, liability, security interest, interest, mortgage, pledge, restriction or charge (including any conditional sale or other title retention agreement) or other similar right held by any Person.

"**Material Adverse Effect**" means any change, effect, event, fact, circumstance, or development that, individually or in the aggregate, has had or reasonably could be expected to have a material adverse effect on the Business, the Assumed Liabilities, or the Purchased Assets, taken as a whole but excluding any such effect to the extent resulting from or arising out of or in connection with: (i) the pendency or consummation of the transactions contemplated herein or the public announcement thereof; (ii) changes or conditions affecting the industries generally in which Sellers operate unless such change has a disproportionate effect on the Business or the Purchased Assets; (iii) changes in national or international business, economic, political, or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant

to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America; (iv) changes in financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or interpretations thereof; (vi) changes resulting from the commencement and continuation of the Bankruptcy Cases; (vii) failure of Sellers to meet financial projections, or (viii) any action taken by Sellers as required or contemplated by this Agreement.

"**Order**" means any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"**Past Due**" means with respect to any amounts payable by any Seller an amount payable pursuant to any invoice that is not within the applicable period specified in Section 1.3(a)(iv).

"**Permitted Liens**" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement (but not including Liens related to any Assumed Real Property Leases); (ii) non-monetary Liens that do not materially interfere with the ability of Purchaser to own and operate the Purchased Assets in substantially the manner as operated immediately prior to the execution of this Agreement; (iii) Liens that arise under zoning, building codes, land use and other similar laws, none of which would materially interfere with the ownership or operation by Purchaser of any of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iv) Liens for Taxes not yet due and payable in respect of Purchased Assets; and (v) with respect to leased or licensed property, the terms and conditions of the lease or license applicable thereto.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority (whether federal, state, county, city or otherwise and including any instrumentality, division, agency or department thereof).

"**Petition Date**" means August 9, 2026.

"**Real Property Lease**" means any real property lease arrangement or agreement for the lease of any Restaurant.

"**Sellers' Knowledge**" means the actual knowledge, after reasonable inquiry, of Jordan Meyers, Chief Restructuring Officer of Sellers, and Ben Grossman, Chief Executive Officer of Sellers.

"**Schedule Delivery Date**" means September 29, 2026, or such later date as may be mutually agreed by Sellers, IP Sellers, and Purchaser.

"**Transition Outside Date**" means the date that is one hundred twenty (120) days after the Closing Date.

"**Transition Period**" means the period commencing on the Closing Date and ending on the Transition Outside Date.

"**VDR**" means that certain virtual dataroom administered by Sellers or their representatives to facilitate the transactions contemplated herein.